THE STATE OF OHIO, APPELLEE, *v.* METCALF, APPELLANT.

[Cite as State v. Metcalf (1977), 60 Ohio App. 2d 212.]

(No. CA-1266—Decided December 23, 1977.)

*Mr. Ronald L. Collins,* prosecuting attorney, for appellee.

*Mr. William G. McLane,* for appellant.

DOWD, J. The defendant was convicted by a jury of a violation of R. C. 3719.44 (D) in that "he did unlawfully sell,

barter, exchange, give away or make offer therefor an hallucinogen, *i.e.* marijuana."

The testimony was largely undisputed. On June 28, 1976, Thomas Berry, an undercover narcotics agent working with the Multi-County Narcotics Bureau, confronted Bart Luff about an earlier "bad drug" sale made by Luff to Berry. Berry was accompanied by Randy Imes. Imes, whose exact relationship with the Multi-County Narcotics Bureau was not disclosed, stands six feet two inches tall and weighs 275 pounds. He is the son of a deputy sheriff.

The issue raised on appeal arises from the defense of duress relied upon by the defendant who admitted to giving away a brick of marijuana to his cousin, Bart Luff, because of his fear for the safety of Bart Luff, his family and himself. The trial court, despite the defendant's timely objection, limited the defense of duress to the fear which the defendant entertained on his own behalf, excluding the jury's consideration of the defendant's concern for the safety of his family.

Berry and Imes, after finding Luff, took him for a ride in Berry's automobile where he was physically manhandled by Imes, made to believe that his life was threatened, and told by Berry that Luff was to return the $120 previously paid by Berry for the bad drugs or, in the alternative, deliver good drugs. Berry and Imes were assisted in the threatening process by the appearance of a .357 magnum revolver admitted by Berry to be his weapon. Luff contended that he was threatened by Imes with the loaded .357 magnum. Imes and Berry both admitted that the weapon became evident when it slid onto the car floor and was recovered by Imes, but each denied that Luff was directly threatened with the weapon. Luff was led to believe that Berry had in turn sold the "bad drugs" to Imes and that Imes was demanding satisfaction. Berry referred to Imes as a wild man and, according to Imes' testimony, suggested that Imes was from Steubenville and a member of the "family" as in the "mafia."

After Luff, while still in the company of Berry and Imes, was unable to secure a loan from a friend, Charles Tony, or from his aunt, to make the demanded repayment, he suggested that his cousin, the defendant, might be of assistance. Berry and Imes drove Luff to the defendant's house. When Berry, Imes and Luff arrived at the defendant's house, the

defendant, his wife, an adult relative, the three year old child of the defendant and his wife, and another three year old child were present. The Berry-Imes charade continued. Imes entered the defendant's home armed with the magnum wrapped in a jacket thrown over his arm. Luff begged his cousin, the defendant, for the money to save his life which he declared was threatened by Imes.

When the defendant and his wife indicated they had no available money to help Luff, the conversation turned to drugs as an alternative means of repayment for the "bad drugs" previously sold by Luff to Berry. Eventually the defendant agreed to produce a pound of marijuana if Imes would first leave the house. Imes left, going a short distance away. The defendant's wife then went outside to their van, secured a brick of marijuana and returned it to the defendant, who then, by his testimony, gave it to Luff and, by the testimony of Berry, gave it directly to Berry.

At trial, Berry, Imes, Luff, the defendant, his wife and an adult relative, Darrell Griffy, all present at the defendant's house where the delivery of the marijuana was made, testified to the events leading to the delivery. Luff, Griffy, the defendant and his wife each testified that they experienced fear for themselves and the children. Imes readily admitted the intimidation of Luff prior to the arrival at defendant's house and the fact of his armed presence in the house while the demand for money, or in the alternative, a demand for drugs, was made.

The state's case rests upon the proposition that its agent may by threat or force, *i.e.*, the presence of a six feet two inch, 275 pound man armed with a .357 magnum and described as a member of the "mafia" and a wild man, intimidate one into a delivery of marijuana and thereafter characterize the intimidated delivery as unlawful. We reject such a proposition.

We begin with a consideration of whether the defense of duress for non-homicidal crimes may be predicated on fear for the safety of others. The common law defense of duress is long standing. It constitutes a claim that the defendant's apparent criminal conduct is negated by reason of the fact that he engaged in the conduct as a result of the threat of violence and from which threat he could not safely withdraw. *State* v.

*Good* (1960), 110 Ohio App. 415; *People* v. *Harmon* (1974), 53 Mich. App. 482, 220 N. W. 2d. 212; *People* v. *Killman* (1975), 51 Cal. App. 3d. 951, 124 Cal. Rptr. 673. However, the defense of duress is unavailable where one takes an innocent life. See 21 American Jurisprudence 2d 180, Criminal Law, Section 100.

Closely akin to the defense of duress is the common law defense of necessity. Clark and Marshall, A Treatise of the Law of Crimes 332 (6th ed. 1958), addressed in some detail the defense of necessity beginning with the following definition of necessity:

"[A]n act which would otherwise be a crime may be excused if the person accused can show that it was done only in order to avoid consequences which could not otherwise be avoided, and which, if they had followed, would have inflicted upon him, *or upon others whom he was bound to protect,* inevitable and irreparable evil; that no more was done than was reasonably necessary for that purpose; and that the evil inflicted by it was not disportionate to the evil avoided." (Emphasis added.)

As examples of the successful use of the defense of necessity, Clark and Marshall cite the following:

"1. A person is not guilty in joining a rebellion if it is necessary to save his life. [1]

"2. The crew of a vessel are not guilty of a crime in arising and deposing the master, if it is a case of necessity arising from the unseaworthiness of the vessel. [2]

"3. A vessel is not liable for a violation of the embargo laws where during a legitimate voyage she is obliged by stress of weather to take refuge in a proscribed port."

On the other hand, *United States* v. *Holmes* (C.C. Penn. 1842), 26 F. Cas. 360, and *Regina* v. *Dudley and Stephens* (1884), 14 Q.B.D. 273, All Eng. L. Rpt. (Rep. 1881 to 1885) 61, are famous cases where the defense of necessity in extreme circumstances was rejected. In *Holmes,* the defendant, following the mate's orders to spare women, children and husbands, threw fourteen male passengers from an overloaded life boat following a disaster at sea. Those remaining after

---

[1] *Respublica* v. *McCarty* (Penn. 1781), 2 Dallas 86, 1 L. Ed. 300.

[2] *United States* v. *Ashton,* (C. C. Mass. 1834), 2 Sumner 13.

the fourteen males had been thrown overboard were saved and Holmes was prosecuted for manslaughter of one of the passengers. Holmes was convicted on an instruction of law that indicated that a seaman was obligated by his calling to sacrifice himself to save the passengers rather than vice versa.

In *Regina,* three shipwrecked seamen killed a fourth member of their lifeboat to avoid starvation. Later the three survivors were rescued. The jury returned a special verdict reciting the facts and concluding that all four men would have died of starvation before rescue had they not sacrificed one to save the other three. The question of whether the facts established a charge of murder remained for the judgment of the court. The court held that one was not justified in taking the life of another innocent person to save his own and found the persons guilty of capital murder.

We set forth the law of the defense of necessity because it allows the defense to be invoked where the offender acts not only to protect himself but also to protect others whom he is bound to protect.[3] Although only sparse authority exists on the issue of whether duress is available where the offender seeks to protect others such as the members of his family, [4] we conclude that both reasoning and precedent in the context of the law of necessity dictate that the defense of duress may be invoked not only where the defendant fears for his own safety but, also, where he fears for the safety of others, in particular the members of his family. Accordingly, we find that the trial court erred to the prejudice of the defendant in failing to include in the instruction some reference to the defendant's concern for his wife, the children, his cousin and the guest in his house. [5] The sole assignment of error is sustained. [6]

[3] Subject to the limitation that the evil inflicted was not disportionate to the evil avoided.

[4] See annotation 40 ALR 2d 908, 917.

[5] The court's instruction stated:

"The Defendant has interposed the defense of duress, claiming that he acted out of fear for his life or of great bodily harm. When a person is forced to participate in a crime against his will because he honestly believes and has good reason to believe that he is in immediate danger of death or great bodily harm, and that there was no reasonable opportunity to escape, he is entitled to be acquitted on the ground of duress.* * *"

The facts in this case, viewed in a light most favorable to the prosecution, require further responses.

Here the agents of duress are officers of the law. They are a part of the government. In short, the government, *i.e.,* the state of Ohio, used duress as a strategy to compel the delivery of a brick of marijuana. The duress was first applied directly to Luff and then continued at the defendant's house. The government applied duress to the defendant in the following manner:

1. Both Berry and Imes accompanied Luff to the defendant's home after threatening Luff to the extent that he begged for his life.

2. While at the defendant's home and in the defendant's presence, Berry and Imes continued with a course of action designed to lead all observers to believe that Luff must produce either cash or drugs or suffer at least serious physical harm.

3. In the defendant's presence, inside his home, Imes appeared to be armed and in fact he was.

4. During the conduct described in paragraph 2, the government agents knew that defendant's wife and two small children were present, and that the defendant knew of their location.

In our view, the label of duress is an incomplete description of this conduct because the agents of duress are the government. In our research, we find no reported example of this kind of conduct by law enforcement officers either in a general discussion of the common law defense of duress or entrapment.

Entrapment is the term applied to conduct by the government which serves to convince an otherwise unwilling person to commit a criminal act. The defense of entrapment fails when the defendant, before the act, was already predisposed to commit the act. *Sherman* v. *United States* (1958), 356 U. S. 369. Predisposition negates entrapment.

In delivering the opinion of the court in *Sherman*, Chief Justice Earl Warren, after noting that the defense of entrap-

---

[6] Standing alone, the error in the instructions would require that the conviction be set aside and a new trial ordered.

ment was recognized by *Sorrells v. United States* (1932), 287 U. S. 435 discussed the nature of entrapment, at page 372:

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, 'A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.' Then stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.

"However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. (Emphasis supplied.)***To determine whether entrapment has been established a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in *Sorrells.* On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence.***"

As entrapment occurs where a law enforcement officer solicits or encourages another person to engage in criminal conduct when he is not then otherwise disposed to do so, a jury issue is inevitably presented on the issue of predisposition. [7] But, in this case, no jury issue exists for the reasons that follow.

---

[7] In rebuttal, Berry testified that after the defendant had agreed to supply the brick of marijuana, the defendant's wife, in the presence of the defendant admonished Bart Luff as follows:

"Bart, you have sold stuff before and you know enough to not rip anybody off. ***We're business people. We have got to make money on this and we cannot give it

Here the evidence, viewed in a light most favorable to the prosecution, demonstrates that the government agents, Berry and Imes, engaged in a course of conduct not merely to solicit or encourage criminal conduct, but rather to compel criminal conduct. In short, we have entrapment by duress or to coin a phrase, aggravated entrapment. It crushes the innocent as swiftly as the guilty and leaves no trace of which was which. The innocent are predisposed to respond to the stimulus of duress where, as here, the evil threatened is grossly disproportionate to the evil inherent in the criminal conduct compelled.

When those circumstances exist the, "predisposition test" advanced by *Sherman* and *Sorrells* is unwarranted. Whenever the government undertakes to entrap by duress such conduct must fail as a matter of sound public policy. Duress by law enforcement personnel is as hostile to the preservation of liberty as is the use by the government of force to extract a confession of crime from an innocent person.

Where, as here, the testimony viewed in a light most favorable to the prosecution establishes entrapment by duress, the judicial response must be to enter an acquittal of the criminal charge flowing from such entrapment. We have already declared that the trial court's erroneous instructions would have entitled the defendant to a reversal of his conviction and a new trial. However, finding that it was plain error for the trial court not to have entered an acquittal in this case, the defendant's conviction is reversed, the sentence is vacated and a judgment of acquittal is hereby entered and the defendant is ordered discharged.

*Judgment reversed.*

RUTHERFORD, P. J., and PUTMAN, J., concur.

---

to you for nothing.***If we give it to you, you have got to have money back here within one week."

She also stated: "***[A]nd Bart agreed to that."

Such testimony, if believed, is evidence of pre-disposition to sell marijuana and would defeat a claim of entrapment absent the fact of duress.