The STATE of Ohio, Appellee,

v.

LUFF et al., Appellants.

[Cite as *State v. Luff* (1993), 85 Ohio App.3d 785.]

Court of Appeals of Ohio,
Lucas County.

No. L–91–226.

Decided April 23, 1993.

788

*Steven LaTourette,* Lake County Prosecuting Attorney, and *Geoffrey Weaver,* Assistant Prosecuting Attorney, for appellee.

*J. Ross Haffey,* for appellants.

---

MELVIN L. RESNICK, Judge.

This matter is before the court on appeal from the Lucas County Common Pleas Court wherein appellant, Ronald Boyd Luff, was convicted on five counts of aggravated murder with specifications and four counts of kidnapping. The facts giving rise to this appeal are as follows.

At the age of eight, Ronald Boyd Luff was baptized into the Reorganized Church of the Latter Day Saints ("RLDS"), a form of Mormonism centered in Independence, Missouri. Growing up in Missouri, Luff remained a loyal and active member of the RLDS. As a young man he became disenchanted with the church because of certain doctrinal changes that were taking place, and he began to search for a more fundamentalist approach to the RLDS faith. In 1987, Luff heard about a self-proclaimed RLDS prophet named Jeffrey Don Lundgren. Lundgren worked as a tour guide at the only RLDS temple in existence located in Kirtland, Ohio. Established in the 1830s by Mormon church founder, Joseph Smith, the Kirtland Temple was historically and religiously important to RLDS members. Luff had heard from another RLDS member that Lundgren was a

very inspiring man and that a visit to the temple would be a "blessed experience." Having reached a point in his religious life where he was "looking for answers," Luff decided to visit the Kirtland Temple. Luff was hoping that while in Kirtland he would receive guidance from God on what to do with the rest of his life.

In Kirtland, Luff spoke with Lundgren for several hours. Lundgren explained that God wanted a perfect society established in Kirtland, Ohio, in preparation for the second coming of Jesus Christ. Luff was impressed with Lundgren's overall knowledge of church history and his scriptural understanding. Luff was also impressed with the small group of followers Lundgren had acquired and their strong commitment to their religious beliefs. Approximately two weeks after he first met with Lundgren, Luff, his wife and two children moved to Kirtland.

In January 1988, the RLDS asked Lundgren to leave the church and his volunteer position as a temple tour guide due to ethical and moral problems RLDS officials had with him, his financial dealings and his teachings. The Lundgren family was also forced to leave their temple-owned housing. They eventually moved to a rented 15.7–acre farm.

Approximately twenty people, including Luff, formed a separate religious cult around Lundgren and his teachings. Most of Lundgren's followers maintained outside employment but turned a substantial portion of their income over to Lundgren, who was not employed. Lundgren effectively isolated his followers by monopolizing their free time with religion classes and work projects on the farm. He discouraged all forms of independent thinking among his followers. He frequently criticized them for being "wrong" and threatened them with death if they failed to follow his rules. Lundgren's followers were made to feel responsible for many global problems, such as famine in Ethiopia or the 1988 drought in the United States. Lundgren's followers eventually became so psychologically and socially dependent on him that they were afraid to express any doubts they had about his teachings.

In many of the classes Lundgren conducted, he discussed a "takeover" of the Kirtland Temple. Lundgren devised a plan whereby he and his followers would storm the temple at night and take it over from the RLDS church. The RLDS church, located across the street from the temple, would be blown up and several church officials would be executed. On the morning after the takeover, Lundgren told his followers, Christ would appear in the temple. Lundgren's followers prepared for weeks in anticipation of the takeover. They collected medical supplies, weapons, ammunition and military clothing. A week before the designated date of the takeover, Lundgren canceled the plan, blaming his followers for their collective state of sin which prevented them from being within the presence of God.

In early 1989, Lundgren began telling his followers that the end of time was approaching and it was time for them to travel into the wilderness to see God. Before God would appear, however, five followers would have to be sacrificed or killed. The sacrifices, according to Lundgren, would allow his remaining followers to see God. Lundgren decided the five sacrificial followers would be Dennis Avery, his wife Cheryl Avery, their three daughters Trina, fifteen years old, Rebecca, thirteen years old, and Karen, seven years old.

Pursuant to Lundgren's instructions, Luff and some of the other followers dug a pit inside the barn. On the evening of April 17, 1989, the Avery family was called to the farm. The Averys, unaware of their fate, believed the time had come to go into the wilderness and that they would be accompanying the rest of the group. Dinner was served at the farm house. After dinner, Lundgren instructed Luff to bring the Averys out to the barn one at a time in the order of oldest to youngest. Luff approached Dennis Avery in the farm house and told him he was needed in the barn. Once Dennis Avery walked through the barn, Luff attempted to knock him unconscious with a stun gun. The other followers present in the barn used duct tape to bind Dennis Avery's feet, hands, and mouth. He was then placed in the pit and shot twice by Lundgren. Luff searched Dennis Avery's pockets, to no avail, for the key to the motel room the family had been staying in. Lundgren then instructed Luff to "bring in the next one." Luff went back to the farm house and told Cheryl Avery that her husband needed her in the barn. As Cheryl Avery entered the barn she too had her feet, hands and mouth duct-taped. She was placed in the pit and shot twice by Lundgren. The three children were separately lured to the barn, duct-taped, shot to death by Lundgren and laid in the pit. Those present in the barn filled in the pit and then joined the other followers for a class back at the farm house. The topic of the class that evening was the death of the Averys. The next day, Lundgren and his followers packed their belongings, left Kirtland and traveled to the wilderness of West Virginia. The group remained there until September 1989 when they moved to Missouri. In Missouri, the group split up as Lundgren's followers began to doubt his teachings.

On December 31, 1989, Lundgren follower, Keith Johnson, went to the Federal Bureau of Alcohol, Tobacco and Firearms in Kansas City, Missouri and reported that the bodies of the five Avery family members could be found buried in a barn in Kirtland, Ohio. Luff turned himself into authorities on January 4, 1990.

## I

On August 24, 1990, Luff was indicted by the Lake County Grand Jury on five counts of aggravated murder, each with two death penalty specifications, five counts of kidnapping and one count of aggravated robbery. On August 31, 1990,

Luff entered a plea of not guilty and not guilty by reason of insanity to all of the charges. On October 11, 1990, Luff motioned for a change of venue. After a nine-day hearing, the motion was granted and venue was transferred to the Lucas County Court of Common Pleas. On January 7, 1991, a jury found him guilty on five counts of aggravated murder with death penalty specifications and four counts of kidnapping. He was sentenced to five consecutive life terms in prison. Luff now appeals setting forth the following assignments of error:

"Assignment of Error No. I

"The trial court erred in its instructions to the jury on the insanity defense of the appellant.

"Assignment of Error No. II

"The trial court erred when it failed to dismiss the second indictment against appellant, in that it violated appellant's statutory and constitutional rights to a speedy trial.

"Assignment of Error No. III

"The trial court erred to the prejudice of the appellant when it failed to permit appellant to introduce certain expert testimony in violation of appellant's constitutional rights to compulsory process and due process of law.

"Assignment of Error No. IV

"The trial court erred to the prejudice of appellant by failing to charge the jury that fear for the life of another person or fear of great bodily harm to another person, such as a family member, may constitute duress.

"Assignment of Error No. V

"The trial court erred to the prejudice of appellant by convicting and sentencing appellant on allied offenses of similar import, in violation of appellant's right to be free from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

"Assignment of Error No. VI

"The trial court erred to the prejudice of appellant by charging the jury on aiding and abetting in violation of appellant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and appellant's right to indictment by a grand jury as guaranteed by Article I, Section 10 of the Ohio Constitution."

In Luff's first assignment of error, he contends that the court erred in its instructions to the jury on the issue of insanity. The court instructed the jury, over Luff's objection, as follows:

"The plea of not guilty by reason of insanity raises the issue of insanity of the Defendant at the time of the commission of the act.

"To establish the defense of insanity, the accused must prove—must prove by a preponderance of the evidence that at the time of the offenses, he did not know, as a result of a *severe* mental disease or defect, the wrongfulness of his acts.

"In other words, the Defendant must prove by a preponderance of the evidence that due to a *severe* disease or defect of the mind, he did not know his acts were wrong.

"A person is insane and not responsible for criminal conduct, if, at the time of his act:

"a) he has a severe mental disease or defect; and, b) such severe mental disease or defect impaired his reason; and c) his reason was so impaired that he did not have the capacity to know the wrongfulness of his conduct.

"In other words, a person is insane if a severe mental disease or defect so impaired his mental power to understand the nature and consequences of his act that he did not know that the particular act was wrong." (Emphasis added.)

This instruction parallels R.C. 2901.01(N)'s definition which states "[a] person is 'not guilty by reason of insanity' relative to a charge of an offense only if he proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts." R.C. 2901.01(N) went into effect on July 24, 1990.

 Luff argues that R.C. 2901.01(N) is not applicable to his case because the murders occurred in April 1989. Luff argues that the jury's instruction on insanity should have followed *State v. Staten* (1969), 18 Ohio St.2d 13, 47 O.O.2d 82, 247 N.E.2d 293. The definition of "insanity" set forth in *Staten* was followed by courts prior to the enactment of R.C. 2901.01(N). The *Staten* syllabus states:

"1. One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law. * * *

"2. In order to establish the defense of insanity where raised by plea in a criminal proceeding, the accused must establish by a preponderance of the evidence that disease or other defect of his mind had so impaired his reason that, at the time of the criminal act with which he is charged, either he did not know that such act was wrong or he did not have the ability to refrain from doing that act."

Luff argues that the court's jury instruction on insanity violates the *ex post facto* clause of both the United States Constitution and the Ohio Constitution. The *ex post facto* clause prohibits the enactment of any law " 'which imposes a punishment for an àct which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.' " *Weaver v. Graham* (1981), 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 22, citing *Cummings v. Missouri* (1867), 71 U.S. (4 Wall.) 277, 325–326, 18 L.Ed. 356, 363–364. An *ex post facto* law must be retrospective, that is, it must apply to events occurring before its enactment and it must disadvantage the person affected by it. *Weaver v. Graham, supra,* 450 U.S. at 29, 101 S.Ct. at 964, 67 L.Ed.2d at 23. A law is also considered *ex post facto* if it deprives a person charged with a crime of any defense which was available at the time the crime was committed. *Collins v. Youngblood* (1990), 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30, 39, citing *Beazell v. Ohio* (1925), 269 U.S. 167, 169–170, 46 S.Ct. 68, 69, 70 L.Ed. 216, 217.

R.C. 1.48 provides "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 2901.01(N) was not expressly made retrospective. As it was enacted in 1990, R.C. 2901.01(N) is inapplicable to the present case which concerns crimes committed in 1989. Therefore, we conclude that the trial court erred in its instruction to the jury on the insanity defense. Moreover, the court's application of R.C. 2901.01(N) violated the *ex post facto* clause of the United States and Ohio Constitutions. R.C. 2901.01(N) narrowed the definition of insanity by eliminating the volitional prong of the *Staten* test and adding the word "severe" to describe a defendant's mental disease or defect. Because R.C. 2901.01(N) significantly changed the evidentiary standard of insanity, the court's retrospective application of R.C. 2901.01(N) deprived Luff of a defense that was available to him according to the law at the time the crimes were committed.

■ Although we find error in the trial court's jury instruction on insanity, we find this error to be harmless. The Ohio Supreme Court has held " ' * * * [w]e conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.' " *State v. Williams* (1983), 6 Ohio St.3d 281, 286, 6 OBR 345, 349, 452 N.E.2d 1323, 1330, citing *Chapman v. California* (1967), 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709. "In order to be deemed nonprejudicial, error of constitutional stature, either state or federal, must be 'harmless beyond a reasonable doubt.' " *State v. Williams, supra,* at 286, 6 OBR at 349, 452 N.E.2d at 1330, citing *Chapman v. California, supra,* at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 711.

Psychiatrist Kurt A. Bertschinger testified for the defense regarding Luff's sanity. Dr. Bertschinger cited the *Staten* case as authority for the legal definition of insanity. Dr. Bertschinger testified that at the time of the murders, Luff's ability to reason was severely impaired. On cross-examination, Dr. Bertschinger testified that Luff did not suffer from a diagnosable mental illness or defect. Dr. Bertschinger testified that Luff had the ability and in fact did recognize that his participation in the death of the Averys was legally wrong. However, Dr. Bertschinger testified that Luff did not have the capacity to recognize that the death of the Avery family was morally wrong.

Under the *Staten* standard of insanity, it must be determined whether the defendant had the capacity to know that his actions were legally wrong. "In a criminal case, the accused is charged with violating a specific law, and the design of the insanity defense is to test whether he has the capacity to know that his conduct would violate the law." *State v. Huntley* (Sept. 2, 1981), Hamilton App. No. C–800780, unreported, 1981 WL 9989.

Viewing Dr. Bertschinger's testimony in its entirety, we conclude that no reasonable jury could find that the *Staten* defense was established by a preponderance of the evidence. Accordingly, the court's error in instructing the jury was harmless beyond a reasonable doubt and Luff's first assignment of error is found not well taken.

In Luff's second assignment of error, he contends that the court erred when it failed to dismiss the second indictment against appellant. Luff contends that his statutory and constitutional right to a speedy trial was violated. The following procedural history is relevant to this assignment of error.

On January 5, 1990, Luff was indicted on five counts of aggravated murder, each with two death penalty specifications and five counts of kidnapping. The case titled *State v. Luff* was assigned case No. 90–CR–014. On February 7, 1990, Luff executed a written waiver of his speedy trial right in case No. 90–CR–014, wherein he consented to the continuance of the case until October 1, 1990.

On August 24, 1990, Luff was again indicted on five counts of aggravated murder and five counts of kidnapping. The case was also titled *State v. Luff* and was assigned case No. 90–CR–418. This second indictment involved the same set of facts and circumstances. It read exactly the same as the indictment in case No. 90–CR–014 except that the second indictment included an additional death penalty specification as to count one, the aggravated murder of Dennis Avery. The second indictment also contained an additional count of aggravated robbery.

On August 31, 1990, Luff filed a motion pursuant to R.C. 2941.32 to require the state to elect between case Nos. 90–CR–014 and 90–CR–418. On September 5, 1990, the state filed a motion for joinder asking the court to join the two

indictments. On September 10, 1990, the court granted the state's motion. On September 19, 1990, the court entered a *nolle prosequi* in case No. 90–CR–014 because of Luff's reindictment on related charges in case No. 90–CR–418.

On September 28, 1990, Luff filed a motion to dismiss the indictment in case No. 90–CR–418, arguing that his constitutional and statutory speedy trial rights were violated. Luff had never executed a separate waiver of his speedy trial rights under case No. 90–CR–418. On October 15, 1990, the court granted Luff's motion in part and denied it in part. The court dismissed the third death penalty specification relating to count one in the indictment and dismissed count eleven, the charge of aggravated robbery. The court denied Luff's motion as to the remaining parts of the indictment. As a result, the indictment in case No. 90–CR–418 was identical to the original indictment handed down in case No. 90–CR–014.

The issue before us in this assignment of error is whether or not Luff's waiver of his speedy trial rights in case No. 90–CR–014 applied to case No. 90–CR–418, the case in which he was convicted.

The Sixth Amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *." This right is made obligatory on the state through the Fourteenth Amendment. *State v. Singer* (1977), 50 Ohio St.2d 103, 106, 4 O.O.3d 237, 239, 362 N.E.2d 1216, 1219. The Ohio General Assembly has codified the right to a speedy trial in R.C. 2945.71. As it applies to this case, R.C. 2945.71 states that a person charged with a felony shall be brought to trial within two hundred seventy days after his arrest. The right to a speedy trial is "an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Marion* (1971), 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478.

The Ohio Supreme Court has held, "[w]hen an accused waives the right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of circumstances that are brought subsequent to the execution of the waiver." *State v. Adams* (1989), 43 Ohio St.3d 67, 538 N.E.2d 1025, syllabus. The defendant in *Adams* was arrested for a violation of R.C. 4511.19(A)(3), operating a vehicle while having a concentration of ten-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his breath. The defendant executed a waiver of his speedy trial right at arraignment. Approximately three months later, the trial court entered a *nolle prosequi* as to the defendant's charge of violating R.C. 4511.19(A)(3). The next day, the defendant was charged with violating R.C. 4511.19(A)(1), operating a motor vehicle while under the influence of alcohol. This subsequent charge arose

from the same set of facts and circumstances as found in the initial complaint. The defendant filed a motion to dismiss, arguing that his speedy trial right had been violated. The trial court denied the defendant's motion, apparently applying the defendant's waiver of speedy trial in the initial charge to the subsequent charge. This appellate court affirmed that decision and an appeal was taken to the Ohio Supreme Court.

The Ohio Supreme Court reversed our judgment. The court recognized that a defendant's waiver of speedy trial must be done knowingly, voluntarily and intelligently. *Id.*, 43 Ohio St.3d at 69, 538 N.E.2d at 1027. The court went on to state:

"For a waiver to be entered into knowingly, *it is elementary that the defendant understand the nature of the charges against him,* as well as know exactly what is being waived and the extent of the waiver. 'Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.' *Brady v. United States* (1970), 397 U.S. 742, 748 [90 S.Ct. 1463, 1468, 25 L.Ed.2d 747, 756]. See, also, *State v. Ruppert* (1978), 54 Ohio St.2d 263, 8 O.O.3d 232, 375 N.E.2d 1250.

"* * * *

"While it is true that in the case before us both charges stem from R.C. 4511.19, *they nevertheless are distinct charges, which could involve different defenses at time of trial.* As seen here, the fact that appellant was not driving on a public road proved to be an effective defense as to the original charge of a violation of R.C. 4511.19(A)(3). In that instance it may have been appropriate to waive the right to a speedy trial, but the accused may not desire to waive the right to a speedy trial as to a charge under R.C. 4511.19(A)(1) *since his defense could be different.* Indeed, a defendant, for tactical reasons may choose to waive the right to a speedy trial as to an initial charge, but if a *nolle prosequi* is entered as to that charge, other *defense considerations may arise which will affect his decision whether to waive the right to a speedy trial as to any subsequent charges stemming from the same set of circumstances.* Thus, a knowing and intelligent waiver cannot be made until all the facts are known by the accused, which includes knowing the exact nature of the crime he is charged with.

"*The United States Supreme Court found that impairment of an accused's defense was the most serious interest protected by the speedy-trial provisions,* 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.' *Barker* [*v. Wingo* (1972)] *supra* [407

U.S. 514] at 532 [92 S.Ct. 2182, at 2193, 33 L.Ed.2d 101, at 118]." (Emphasis added.) *Adams, supra,* 43 Ohio St.3d at 69–70, 538 N.E.2d at 1028.

Clearly, the Supreme Court declined to apply the defendant's previous waiver to the subsequent charge because the subsequent charge was substantively different from the initial charge and therefore subject to its own unique defenses. It is on this basis that we distinguish the *Adams* case from the instant case.

The United States Court of Appeals, District of Columbia Circuit, has held "[a]s a general rule, the filing of a superseding indictment does not affect the speedy trial timetable *for offenses either charged in the original indictment* or required under double jeopardy principles to be joined with such charges." (Emphasis added.) *United States v. Marshall* (C.A.D.C.1991), 935 F.2d 1298, 1302, citing *United States v. Rojas–Contreras* (1985), 474 U.S. 231, 239–240, 106 S.Ct. 555, 559–560, 88 L.Ed.2d 537, 546–547; *United States v. Gonzales* (C.A.5, 1990), 897 F.2d 1312, 1316; *United States v. Karsseboom* (C.A.9, 1989), 881 F.2d 604, 606; *United States v. Roman* (C.A.2, 1987), 822 F.2d 261, 263; *United States v. Thomas* (C.A.7, 1986), 788 F.2d 1250, 1258; *United States v. Novak* (C.A.3, 1983), 715 F.2d 810, 819; District Court of the District of Columbia Loc.R. 306, Section 8(d)(2); see, also, *United States v. Long* (C.A.8, 1990), 900 F.2d 1270, 1275, and fn. 4.

On February 7, 1990, Luff waived his right to a speedy trial on five counts of aggravated murder of the Avery family, each with two death penalty specifications and five counts of kidnapping the Avery family. On August 24, 1990, a superseding indictment was filed which ultimately contained the same charges as the original indictment. After the original indictment was nolled, in September 1990, Luff remained under indictment for five counts of aggravated murder of the Avery family, each count with two death penalty specifications and five counts of kidnapping. Luff's February 7, 1990 waiver of speedy trial was limited in duration until October 1, 1990. On November 26, 1990, Luff was brought to trial on the superseding indictment.

In reviewing speedy trial statutes, the Ohio Supreme Court "recognizes the public's interests not only in the prompt adjudication of criminal cases, but also in obtaining convictions of persons who have committed criminal offenses against the state." *State v. Bonarrigo* (1980), 62 Ohio St.2d 7, 11, 16 O.O.3d 4, 6–7, 402 N.E.2d 530, 534. It is undisputed in the present case that Luff knowingly waived his right to speedy trial in case No. CR–90–014. Following the trial court's decision on Luff's motion to dismiss, the indictment in case No. CR–90–418 differed from the original indictment only in its case number. Luff's ability to defend himself was not impaired through the application of his previous speedy trial waiver as he remained fully apprised of the charges against him. We therefore conclude that the trial court did not violate Luff's right to a speedy trial

in failing to dismiss the second (superseding) indictment. Appellant's second assignment of error is found not well taken.

■ Luff's third assignment of error addresses the court's exclusion of certain expert testimony. Luff has set forth two separate arguments.

First, Luff contends that the court erred in excluding the testimony of sociology professor Dr. Richard J. Ofshe and clinical psychologist Dr. Margaret Thaler Singer. Both witnesses have extensively studied cults. *In camera*, Luff's counsel stated that the main reason their testimony was being offered was to provide the jury with general background information on cults. The witnesses would also explain how Lundgren's cult operated and how Lundgren influenced his followers.

The state objected to the admission of their testimony, citing *State v. Wilcox* (1982), 70 Ohio St.2d 182, 24 O.O.3d 284, 436 N.E.2d 523. The *Wilcox* court held that "[a] defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime." *Id.*, paragraph two of the syllabus. The *Wilcox* court further held that the partial defense of diminished capacity was not recognized in Ohio. *Id.*, paragraph one of the syllabus. Accord *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895. The state, in objecting, noted that the jury had already heard testimony from former Lundgren followers regarding Lundgren's dominating influence. The state argued that Luff was essentially attempting to present a diminished capacity defense through the expert testimony of Ofshe and Singer.

Before ruling on the admissibility of the evidence, the court allowed the witnesses to testify as to their qualifications. The court ultimately agreed with the state and ruled their testimony inadmissible on the basis of *Wilcox*. However, the court allowed Luff's counsel to proffer the testimony of the witnesses outside the hearing of the jury. The proffered testimony is as follows.

Dr. Ofshe is a professor at the University of California at Berkeley, whose specialty is the study of extreme techniques of influence and techniques of social control in light controlled groups. He teaches undergraduate level courses on thought reform influence and social control. Dr. Ofshe would testify that a cult is a group of people extremely devoted to one person or an idea. He would testify that the characteristics of cults are mind control and social isolation. Dr. Ofshe would testify that he interviewed Luff and other followers of Lundgren. He also reviewed Luff's psychiatric reports. Dr. Ofshe would testify that the Lundgren group indeed fit his definition of a cult. Dr. Ofshe would testify that Lundgren influenced Luff to the point where Luff had little ability to think for himself.

Dr. Singer, also a professor at the University of California at Berkeley, has studied the influence people have on each other. In addition to her work on cults, Dr. Singer has studied indoctrination techniques that have been used on prisoners of war. She has also co-authored a publication on "thought reform" with Dr. Ofshe. Dr. Singer would testify in detail about Lundgren's ability to manipulate Luff and the other followers. Dr. Singer would testify that Lundgren had such control over the minds of his followers that they were unable to think on their own or to make independent decisions. In executing this control, Lundgren was able to convince his followers that no law mattered except for Lundgren's law. Dr. Singer would testify that had Luff never met Lundgren, Luff most likely would have lived his life as a law abiding citizen.

Evid.R. 702 states: "[I]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "Rulings concerning the admissibility of expert testimony are within the discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion." *Frank v. Vulcan Materials Co.* (1988), 55 Ohio App.3d 153, 155, 563 N.E.2d 339, 342; see, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, 265, 15 OBR 379, 401, 473 N.E.2d 768, 791. Abuse of discretion connotes more than an error in judgment. It must be shown that the trial court's ruling was arbitrary, unreasonable, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 157.

Under the theory of diminished capacity, a defendant must prove that his diminished mental capacity precluded him from forming the specific intent to commit the charged crime. *Wilcox, supra,* 70 Ohio St.2d at 185, 24 O.O.3d at 286, 436 N.E.2d at 525. Most often, the defendant is alleging he has an incapacity to reflect or control the behaviors that produce the criminal conduct. *United States v. Cameron* (C.A.11, 1990), 907 F.2d 1051, 1066. The *Wilcox* court, in rejecting the defense of diminished capacity, recognized the liberality of the *Staten* insanity test. "Thus we see no reason to fashion a halfway measure, *e.g.,* diminished capacity, when an accused may present a meaningful insanity defense in a proper case." *Wilcox, supra,* 70 Ohio St.2d at 188, 24 O.O.3d at 288, 436 N.E.2d at 527.

Our review of Dr. Ofshe's and Dr. Singer's qualifications as well as their proffered testimony leads us to the conclusion that the court did not abuse its discretion in excluding their testimony under *Wilcox.* Dr. Ofshe's and Dr. Singer's testimony regarding Lundgren's tight control over Luff's mind would have been probative of Luff's diminished capacity to form the specific mental intent to commit aggravated murder and kidnapping. The proffered testimony was offered to prove that appellant lacked the capacity or was incapable of

forming the intent necessary for the crimes charged. Specifically, the proffered testimony focused on Luff's incapacity to reflect or control the behavior that produced the criminal conduct. It did not focus on Luff's state of mind at the time of the charged offenses. Moreover, in affirming the trial court's decision to exclude the testimony, we take note of the decision in *United States v. Fishman* (N.D.Cal.1990), 743 F.Supp. 713. In that case, the proffered expert testimony of Dr. Ofshe and Dr. Singer regarding the influence techniques used in religious cults was ruled inadmissible on the basis that their theories were not sufficiently established within the scientific community. *Id.* at 720.

■ Luff's second argument under this assignment of error deals with the constitutionality of the *Wilcox* decision. Luff contends that the holding in *Wilcox* prohibiting expert psychiatric evidence, unrelated to the insanity defense, to show that the defendant lacked the mental capacity to form the specific mental state required for a particular crime, violates his constitutional right to compulsory process. Luff contends that the *Wilcox* case inhibits the ability of the accused to negate an element of the offense charged.

This argument requires us to distinguish between the affirmative defense of diminished capacity and the use of psychiatric evidence to disprove *mens rea.* The Third Circuit Court of Appeals in *United States v. Pohlot* (C.A.3, 1987), 827 F.2d 889, discussed the issue raised in this assignment of error in the context of the Insanity Defense Reform Act of 1981, Section 17, Title 18, U.S.Code. The statute reads as follows:

"It is an affirmative defense to a prosecution under any federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."

The *Pohlot* court read the Insanity Defense Reform Act to preclude the use of a diminished capacity defense. *Id.* at 890. The *Pohlot* court defined diminished capacity as a defense showing not only that the defendant lacked the *mens rea* in a particular case but also that he lacked the *capacity* to form the *mens rea. Id.* at 903. The court distinguished the defense from what it viewed as an evidentiary doctrine allowing evidence of a defendant's mental abnormality to negate *mens rea.* Examining these two concepts in light of the Insanity Defense Reform Act, the court stated: "[B]oth the wording of the statute and the legislative history leave no doubt that Congress intended, as the Senate Report stated, to bar only alternative 'affirmative defenses' that 'excuse' misconduct not evidence that disproves an element of the crime itself." *Id.* at 897. The court explained that the use of expert testimony for the purpose of disproving an element of a crime is entirely distinct from the use of such testimony to relieve a defendant of criminal

responsibility based on his lack of or diminished capacity to form the requisite *mens rea. Id.* at 897, citing *United States v. Demma* (C.A.9, 1975), 523 F.2d 981, 986. The court also cited *In re Winship* (1970), 397 U.S. 358, 363–364, 90 S.Ct. 1068, 1072–1073, 25 L.Ed.2d 368, 375, for the proposition that due process requires the government to prove every element of a criminal offense beyond a reasonable doubt. *Pohlot,* 827 F.2d at 901.

The court further stated:

" * * * [A] rule barring evidence on the issue of mens rea may be unconstitutional so long as we determine criminal liability in part through subjective states of mind.

" * * *

"We do not decide the constitutionality of any Congressional attempt to bar evidence of mental abnormality from the issue of mens rea. The constitutional issues are sufficiently substantial, however, that we are unwilling to create a rule of evidence that would raise them in the absence of explicit Congressional direction. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 [541] (1979) (in absence of clear Congressional direction, court should construe statute to avoid serious constitutional question). For all the foregoing reasons, we therefore reject the government's contention that the Insanity Defense Reform Act either explicitly or implicitly bars a defendant from introducing evidence of mental abnormality on the issue of mens rea." *Pohlot,* 827 F.2d at 901–903; accord *United States v. Cameron, supra,* at 1065–1066.

▉ Luff contends that the holding in the *Wilcox* case is unconstitutional as it prohibits a defendant from presenting evidence disproving an element of the crime charged. Once again, the relevant holding of *Wilcox* is as follows: "[A] defendant may not offer expert psychiatric testimony, unrelated to the insanity defense, to show that the defendant *lacked the mental capacity* to form the specific mental state required for a particular crime or degree of crime." (Emphasis added.) *Id.,* paragraph two of the syllabus.

We agree with the *Pohlot* court that an important distinction must be made between the affirmative defense of diminished capacity and the admission of evidence negating an element of the crime charged. While Luff has raised an intriguing constitutional issue, we need not reach the merits of his argument. The wording of the *Wilcox* holding is clearly limited to the evidence supporting a defendant's diminished capacity defense. It does not prohibit a defendant from presenting evidence disproving an element of the crime charged.

Based on the foregoing, we conclude that the court did not abuse its discretion in excluding the expert testimony of Dr. Ofshe and Dr. Singer. We further

conclude that the application of *State v. Wilcox* to this case did not violate Luff's constitutional right to compulsory process. Luff's third assignment of error is found not well taken.

In his fourth assignment of error, Luff contends that the court erred in instructing the jury on the affirmative defense of duress.

Pursuant to Crim.R. 30, Luff timely filed the following written request for a jury instruction.

"DURESS

"1. The Defendant herein has claimed the defense of duress relative to all charges herein, claiming that he acted out of fear for his life or of great bodily harm. When a person is forced to participate in an offense against his will because he honestly believes and has good reason to believe that he is in immediate danger of death or great bodily harm, and that there was no reasonable opportunity to escape, he is entitled to be acquitted on the grounds of duress. Fear for the life of another person or fear of great bodily harm to another person, such as a family member, may also constitute duress.

"2. The Defendant is asserting duress as an affirmative defense. The burden of going forward with the evidence of duress and the burden of proving the affirmative defense of duress are upon the Defendant. He must establish such defense by a preponderance of the evidence. Preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it outweighs or overbalances in your minds the evidence opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with quantity, that is, the greater number of witnesses. In determining whether or not the affirmative defense of duress has been proved by a preponderance of the evidence, you should consider all of the evidence bearing upon the affirmative defense regardless of who produced it. If the Defendant fails to establish his defense of duress, the State still must prove to you beyond a reasonable doubt all of the elements of the crime or crimes charged.

"3. If you find by a preponderance or greater weight of the evidence that the will of the Defendant, Ronald Luff, was overcome by fear of death or great bodily harm to either himself or a member of his family, at the hand of Jeffrey Lundgren, and that it was reasonable for him to believe that he could not avoid participation without the immediate exposure to such death or great bodily harm, then you must find him not guilty.

"4. OJI, Section 411.20."

The court instructed the jury as follows:

"As to Counts Six through Ten, each of which alleges the charge of kidnapping, and as to the second specification of kidnapping in each of Counts One through Five, the Defendant has claimed the defense of duress, claiming that he acted out of fear for his life or of great bodily harm. When a person is forced to participate in an offense against his will because he honestly believes and has good reason to believe that he is in immediate danger of death or great bodily harm, and that there was no reasonable opportunity to escape, he is entitled to be acquitted on the grounds of duress.

"The defense of duress is known as an affirmative defense.

"The burden of going forward with the evidence of duress and the burden of proving an affirmative defense are upon the Defendant. He must establish such a defense by a preponderance of the evidence.

"Preponderance of the evidence is the greater weight of the evidence; that is, evidence that you believe because it outweighs or overbalances in your minds the evidence opposed to it.

"A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed. Quality may or may not be identical with quantity.

"In determining whether or not an affirmative defense has been proved by a preponderance of the evidence, you should consider all of the evidence—all of the evidence bearing upon that affirmative defense, regardless of who produced it.

"If the weight of the evidence is equally balanced or if you are unable to determine which side of the affirmative defense has the preponderance, then the Defendant has not established such affirmative defense.

"If the Defendant fails to establish the affirmative defense, the State still must prove to you beyond a reasonable doubt all the elements of the crimes charged.

"If you find by the preponderance or the greater weight of the evidence that the will of the Defendant, Ronald Boyd Luff, was overcome by fear of death or great bodily harm at the hand of Jeffrey Don Lundgren and that it was reasonable for him to believe that he could not avoid participating without immediate—immediate exposure to death or great bodily harm, then you must find him not guilty as to each of the Counts Six through Ten, kidnapping, and as to each of the kidnapping specifications in Counts One through Five for which the Defendant has proven duress by a preponderance of the evidence."

Luff contends that the court erred in not instructing the jury that the defense of duress is available when the evidence shows that a defendant feared for the safety of his family. *State v. Metcalf* (1977), 60 Ohio App.2d 212, 216, 14 O.O.3d 186, 189, 396 N.E.2d 786, 790.

After the completion of arguments, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder. *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph two of the syllabus. In criminal cases, special jury instructions requested by a party must be included, at least in substance, in the trial court's general charge if they are correct, pertinent and timely presented. *State v. Guster* (1981), 66 Ohio St.2d 266, 269, 20 O.O.3d 249, 251, 421 N.E.2d 157, 160. However, a court's failure to give a requested pertinent instruction may be deemed harmless error when the evidence clearly supports a guilty verdict beyond a reasonable doubt. *State v. Mitchell* (1989), 60 Ohio App.3d 106, 109, 574 N.E.2d 573, 577.

■ Luff testified that Lundgren had threatened to destroy his family. Luff testified that was his greatest fear and that he believed Lundgren was capable of harming his family. Based on this testimony, we conclude that Luff's requested instruction was pertinent and should have been given by the trial court. However, we find the court's failure to give the requested instruction harmless error. When asked on cross-examination specifically about the murder of the Averys and why he did not prevent their death, Luff testified that "there was no way that I could stop an act of God and there was no way that * * * it was not right as an act of God * * *."

Viewing the evidence in its entirety, we conclude that the evidence clearly supports a verdict of guilty beyond a reasonable doubt. Appellant's fourth assignment of error is found not well taken.

■ In his fifth assignment of error, Luff contends that aggravated murder and kidnapping are allied offenses of similar import and he therefore cannot be convicted of both crimes.

" 'Allied offenses of similar import are those offenses whose elements correspond to such a degree that the commission of one offense will result in the commission of the other.' " *State v. Waddy* (1992), 63 Ohio St.3d 424, 448, 588 N.E.2d 819, 837, citing *State v. Mitchell* (1983), 6 Ohio St.3d 416, 418, 6 OBR 463, 464, 453 N.E.2d 593, 594.

In *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, the Ohio Supreme Court addressed the same issue argued in this assignment of error. The court stated:

"A comparison of the elements of kidnapping and aggravated murder clearly shows that they are not similar. Kidnapping, as charged in this case, involves the removing of a person by force, threat, or deception from the place where he is found, or restraining him of his liberty, to facilitate the commission of a felony or the flight thereafter and/or to terrorize or inflict serious physical harm on the

victim. R.C. 2905.01(A)(2) and (3). The aggravated murder count in this case charged appellant with purposely causing the death of another while committing or attempting to commit kidnapping. R.C. 2903.01(B)." *Id.* at 33, 559 N.E.2d at 474.

In *Jells,* the victim was forced into a van. Her kidnapping was completed when the defendant drove off. The defendant later murdered the victim. The *Jells* court rejected the defendant's double jeopardy argument finding the kidnapping to be complete and independent of the murder.

In the present case, Luff used deception to lure the five members of the Avery family into the barn in an effort to facilitate their murder. Once the Averys entered the barn and were restrained with duct tape, their kidnapping was complete. It was then that they were murdered. We conclude that their kidnapping was independent of their murder. Accordingly, Luff's fifth assignment of error is found not well taken.

In his sixth assignment of error, Luff contends that the court erred in instructing the jury on aiding and abetting. Luff contends that the court, in effect, amended the original indictment through the instruction. Luff contends that his constitutional right to have notice of the charges against him was violated.

"When the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor, a jury instruction by the trial court on that subject is proper." *State v. Perryman* (1976), 49 Ohio St.2d 14, 3 O.O.3d 8, 358 N.E.2d 1040, paragraph five of the syllabus; see, also, *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406.

The evidence adduced at trial shows that Luff knew of the impending killings and assisted in digging the Avery family grave. At the direction of Jeffrey Lundgren, Luff separately lured each of the Averys to the barn where they were bound with duct tape and shot by Lundgren. Because this evidence could have reasonably been found to have proven Luff guilty as an aider and abettor, the court's instruction was proper. Accordingly, appellant's sixth assignment of error is found not well taken.

## II

Luff's counsel has also filed a second brief arguing the issue of attorney fees and setting forth the following assignments of error:

"1. The trial court erred and abused its discretion in its rulings on the approval and payment of ordinary and extraordinary attorney fees.

"2. The trial court erred and abused its discretion in its rulings on defense counsel's motion for the approval and payment of expenses (other than experts).

"3. The trial court erred and abused its discretion in its rulings on defense counsel's motion for approval and payment of experts' fees and expenses."

R.C. 2941.51 provides in pertinent part:

"(A) Counsel appointed to a case or selected by an indigent person under division (E) of section 120.16 or division (E) of section 120.26 of the Revised Code, or otherwise appointed by the court, except for counsel appointed by the court to provide legal representation for a person charged with a violation of an ordinance of a municipal corporation, shall be paid for their services by the county the *compensation and expenses that the trial court approves.* Each request for payment shall be accompanied by an affidavit of indigency completed by the indigent person on forms prescribed by the state public defender. Compensation and expenses shall not exceed the amounts fixed by the board of county commissioners pursuant to division (B) of this section." (Emphasis added.)

The maximum amount allowed by the Lake County Commissioners for the defense of indigent defendants is $25,000. The determination of appropriate attorney fees is within the discretion of the trial court. *State ex rel. Martin v. Corrigan* (1986), 25 Ohio St.3d 29, 30, 25 OBR 24, 494 N.E.2d 1128, 1129.

■ In their first assignment of error, counsel contends that the court abused its discretion in its award of ordinary and extraordinary attorney fees. Counsel based their request for ordinary fees on the two thousand eighty hours they claimed were spent on this case over a fourteen-month period. In addition, lead counsel J. Ross Haffey cited his twenty-five years of experience in criminal law and his involvement in twenty-five capital murder cases. As to their motion for extraordinary fees, counsel cited the change of venue to Lucas County and the unusual issues contained in the case such as the cult phenomenon, the dismissal of indictments, insanity and *ex post facto* laws.

The court reviewed Luff's request for ordinary attorney fees under three separate case numbers. Under case No. 90–CR–14, the case in which a *nolle prosequi* was filed, Luff's counsel asked for ordinary fees in the amount of $30,334 and $7,103.71 for out-of-pocket expenses. The court awarded Luff's counsel $15,000 plus $2,999.42 for out-of-pocket expenses.

Under case No. 90–CR–418, the case which proceeded through jury selection until a change of venue was granted, Luff's counsel requested $100,847 in ordinary fees and $1,366 for out-of-pocket expenses. The court found the request to be excessive and awarded Luff's counsel $20,000 in ordinary fees and $1,160.80 for out-of-pocket expenses.

Under Lucas County case No. 90–7432, the case which ultimately went to trial, Luff's counsel requested $110,087 in ordinary fees and $4,275.22 for out-of-pocket expenses. The court also found this request to be excessive. In granting Luff's counsel $25,000 in ordinary fees, the court noted that this was the maximum amount allowed under the Lake County Commissioners' policy. The court also granted Luff's counsel $2,183.31 for out-of-pocket expenses further noting that $5,637.89 had already been expended from public funds for lodging, phone, meals, parking, toll fees and mileage for defense counsel.

Luff's counsel also filed a motion requesting extraordinary fees in the amount of $240,375 under Lucas County case No. 90–7432. In its judgment entry, the court recognized that a number of hearings were held because the case involved a capital murder and a change of venue. The court awarded Luff's counsel $25,000 in extraordinary attorney fees.[1]

Excluding out-of-pocket expenses, Luff's counsel was awarded $85,000 in ordinary and extraordinary attorney fees. We have reviewed the attached documents submitted with counsel's motion and the court's judgment entries on this issue. We conclude that the court's award of ordinary and extraordinary attorney fees was not arbitrary, unreasonable or capricious. Accordingly, counsel's first assignment of error is found not well taken.

In their second assignment of error, counsel contends that the court abused its discretion in awarding counsel out-of-pocket expenses. Under case No. 90–CR–14, counsel was awarded $2,999.42. This amount reflected a previous award of $4,103.77 granted on December 3, 1990. Under case No. 90–CR–418, counsel was awarded $1,160.80. Finally, under Lucas County case No. 90–7432, counsel was awarded $2,183.31.

Counsel contends that the court abused its discretion in its judgment entry by not listing with specificity the exact expenses that were being denied. R.C. 2941.51 does not require the court to specifically account for each expense it refuses to award to counsel. Based on our review of the court's awards, we do not find the court abused its discretion and counsel's second assignment of error is found not well taken.

In their third assignment of error, counsel contends that the court abused its discretion in its award of fees and expenses to three experts.

Counsel requested the following compensation for Dr. Richard Ofshe. Payment for one hundred eighty-eight hours of out-of-court work at the rate of $125 per hour, payment for 4.5 hours of in-court work at the rate of $250 per hour and

---

1. This court will not consider the issue of the propriety of the grant of extraordinary fees as it has not been raised or challenged.

$5,175 in expenses. The court noted that counsel had failed to comply with a February 13, 1990 judgment entry which requested counsel to file a motion naming its expert witnesses and outlining their anticipated fees and expenses. The court found counsel's fee request to be excessive and calculated Dr. Ofshe's fee as follows: payment for fifty-five hours of out-of-court work at the rate of $125 per hour, payment for 4.5 hours of in-court work at the rate of $250 per hour for a total of $8,000. The court also awarded Dr. Ofshe the amount of $5,175 for expenses as requested by counsel.

Counsel requested the following compensation for Dr. Margaret Thaler Singer: payment for one hundred forty-six hours of out-of-court work at the rate of $125 per hour, payment for 3.25 hours of in-court work at the rate of $250 per hour, and $3,639.43 in expenses. The court also found this request to be excessive and reduced the award as follows: payment for 57.5 hours of out-of-court work at the rate of $125 per hour, payment for 3.25 hours of in-court work at the rate of $250 per hour for a total of $8,000. The court also awarded expenses as requested in the amount of $3,639.43.

Counsel requested payment for 252.2 hours of work at the rate of $50 per hour for mitigation specialist/attorney Patricia Snyder. The court found counsel's request to be excessive and awarded Snyder compensation for one hundred ninety hours of work at $50 per hour for a total of $9,500 plus expenses in the amount of $360.85.

Based on our review of counsel's motion for expert fees, the relevant documents attached and submitted with the motion and the court's judgment entries, we find that the court did not abuse its discretion in its award of expert fees and expenses. Counsel's third assignment of error is found not well taken.

On consideration whereof, the court finds that Luff was not prejudiced or prevented from having a fair trial. The court further finds that substantial justice was done Luff's counsel and the judgment of the Lucas County Court of Common Pleas is affirmed. Costs assessed to appellant.

*Judgment affirmed.*

HANDWORK and ABOOD, JJ., concur.