[Cite as *State v. Carreiro*, 2013-Ohio-1103.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2011-12-236 |
| | : | O P I N I O N |
| - vs - | | 3/25/2013 |
| | : | |
| MICHAEL JOSEPH CARREIRO, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR11-06-0813

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Christopher J. Pagan, 1501 First Avenue, Middletown, Ohio 45044, for defendant-appellant

Fred S. Miller, 246 High Street, Hamilton, Ohio 45011, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Michael Joseph Carreiro, appeals his conviction in the Butler County Court of Common Pleas for aggravated murder. For the reasons stated below, we affirm.

{¶ 2} On September 3, 2005, Christine Minnix was killed by her adoptive son,

Michael. Michael suffers from paranoid schizophrenia and hears multiple voices.[1.] On that day, Christine was attending a Labor Day golf outing at a Middletown country club. Dr. Tim Minnix, Christine's husband and Michael's stepfather, was also at the golf outing. Christine was acting as scorekeeper when Michael showed up at the golf course. Christine spoke to Michael and then borrowed a friend's car so that she could take him back to his apartment. Inside the apartment, Michael stabbed Christine multiple times with a kitchen knife, causing her to bleed to death. Christine was discovered by her husband several hours later. One day after the stabbing, police located and arrested Michael near a Meijer department store in Middletown.

{¶ 3} On October 12, 2005, Michael was indicted for the aggravated murder of Christine. Initially, the trial court found Michael not competent to stand trial. Michael's competency was restored six years later, and he was again indicted on the same count of aggravated murder. He pled not guilty by reason of insanity (NGRI). A jury trial was held which established the following facts.

{¶ 4} Middletown Police Department Detective Tim Riggs testified that he interviewed Michael regarding the homicide shortly after Michael's arrest. This interview was recorded and introduced into evidence. During the interview, Michael stated that the voices in his head commanded him to kill his mother. He indicated that he hears multiple voices, one of the voices is God, and that he "thinks" the voice of God told him to kill his mother. He reasoned that God told him to kill his mother because she was trying to destroy him. Throughout the interview, Michael did not consistently refer to the voice that commanded him to commit the murder as God. Michael also stated that he understood that he was guilty, he needed to pay

---

1. Some experts at trial testified that Michael suffers from schizoaffective disorder, which is characterized by symptoms of schizophrenia and a mood disorder. The evidence established that schizoaffective disorder and schizophrenia are closely related and both disorders are severe mental illnesses.

his debt to society, and that he would be going to jail for the death of his mother. Lastly, Michael stated that he wouldn't have killed his mother if he didn't think it was right and it is not always wrong to kill someone when that person "comes from the Devil."

{¶ 5} In the interview, Michael also explained how he executed the murder. He stated that the murder was "premeditated," that he had a plan to lure his mother to his apartment and kill her. He stated that he left a kitchen knife on the counter to kill her, and he told her he needed help with a bill so that she would come into his apartment. After the murder, he washed his hands, changed his shirt, and left his apartment. He went to a movie, the mall, and then a church. During this time, he stated that the voice of God commanded him to commit suicide so that he did not have to spend the rest of his life in jail. He did not kill himself.

{¶ 6} After the introduction of the interview, a series of psychologists and a psychiatrist testified regarding their opinion of Michael's mental illness at the time of the offense. All the doctors agreed that Michael suffers from a severe mental illness and that the illness was operative at the time of the homicide. Dr. Hopes, a mental health expert called by the defense, testified that Michael heard three voices, a voice from God, the devil, and a third voice. Dr. Hopes testified that Michael did not know the moral wrongfulness of his acts because the voice of God commanded him to kill his mother and the third voice convinced him his mother was evil and was going to destroy the world. She noted that the voice of God told Michael to kill his mother earlier but he refused because he wasn't sure if the voice was actually from God. Dr. Hopes also stated that Michael knew his actions violated the law but his straightforward and non-defensive account of his actions in killing his mother in the police interview and his lack of any attempt in hiding the murder weapon, his bloody clothes, or locking the apartment door showed he did not appreciate the moral "wrongfulness" of his acts.

{¶ 7} Another mental health expert called by the defense was Dr. Haskins who agreed that Michael did not appreciate the moral wrongfulness of his acts and that Michael heard the voice of God who told him to kill his mother. Dr. Haskins also acknowledged that before the murder of his mother, Michael had developed a plan to kill his stepfather. Michael believed his stepfather was Satan and that God was commanding him to kill his stepfather. However, when Michael told his neighbor about this plan, she was able to talk him out of it. The neighbor stated that Michael believed his mother was putting his stepfather first, instead of him.

{¶ 8} Lastly, Dr. Chiappone, a forensic psychologist, testified that while he believed Michael suffers from a severe mental illness, Michael understood the wrongfulness of his actions. In support of this conclusion, Dr. Chiappone stated that Michael's actions in killing his mother in a private location, laying out a kitchen knife, cleaning himself up after the crime, and leaving the apartment show that Michael understood his actions were morally wrong. Moreover, while Michael claimed that the voices told him to kill his mother, there was no connection between the voice and his actions. For example, the voices did not tell him how to perform the specific details of the crime, like choosing the murder weapon, changing his clothes, or how to lure his mother into his apartment. Additionally, Michael's conduct in leaving his apartment and his statements show that he didn't want to get caught, he knew he did something wrong, and he was trying to avoid punishment for it.

{¶ 9} At the conclusion of the evidence, the trial court refused Michael's request for a jury instruction defining "wrongfulness" as including "moral wrongfulness." Instead, the court instructed the jury that a defendant is not guilty by reason of insanity if the individual did not understand his actions were legally wrong. The jury rejected the insanity defense and found Michael guilty of aggravated murder. Michael was sentenced to life in prison with parole eligibility after 20 years.

{¶ 10} Michael now appeals, raising a sole assignment of error:

{¶ 11} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT WHEN IT REFUSED TO PROVIDE HIS REQUESTED INSTRUCTION TO THE JURY.

{¶ 12} Michael challenges the trial court's decision refusing to provide his requested jury instruction regarding whether he was not guilty by reason of insanity pursuant to R.C. 2901.01(A)(14). Specifically, Michael argues the court erred when it defined "wrongfulness" to include only whether the defendant knew he committed a legal wrong. Instead, he maintains that "wrongfulness" includes both legal and moral wrongs and the evidence shows that he did not believe he committed a moral wrong when he killed his mother because he was acting under a command from God. The state responds by arguing that "wrongfulness" only requires the defendant to understand that his actions were against the law.

{¶ 13} Jury instructions are matters which are left to the sound discretion of the trial court. *State v. Guster*, 66 Ohio St.2d 266, 271 (1981). Accordingly, we review them for an abuse of discretion. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130.

{¶ 14} Ordinarily, requested instructions should be given if they are correct statements of the law, applicable to the facts in the case, and reasonable minds could reach the conclusion sought by the specific instruction. *State v. Lawson*, 12th Dist. No. CA99-12-226, 2001 WL 433121, *8 (April 30, 2001), citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). A trial court must fully and completely give jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as fact finder. *State v. Comen*, 50 Ohio St. 3d 206 (1990), paragraph two of the syllabus. A trial court has the duty to instruct the jury as to the applicable law on all issues presented in the

- 5 -

case that are supported by the evidence.  *Enderle v. Zettler*, 12th Dist. No. CA2005-11-484, 2006-Ohio-4326, ¶ 35 citing, *Marshall v. Gibson*, 19 Ohio St.3d 10, 12 (1985).

{¶ 15} Michael pled NGRI for the aggravated murder charge.  R.C. 2901.01(A)(14) provides that,

> [a] person is [NGRI] relative to a charge of an offense if the person proves * * * that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, *the wrongfulness of the person's acts.*" (Emphasis added.)

Not guilty by reason of insanity is an affirmative defense that must be proved by the defendant by a preponderance of the evidence.  *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 64.  *See* R.C. 2901.05(A).

{¶ 16} At trial, Michael and the state disagreed over how to instruct the jury regarding "wrongfulness" under R.C. 2901.01(A)(14).  Michael requested an instruction that broadened the definition of "wrongfulness" and allowed the jury to find that a defendant did not know the "wrongfulness" of his conduct if he acts pursuant to a command from God.  This is known as a "deific decree" exception.  In particular, the requested jury instruction stated,

> In some limited instances, a defendant even though he or she recognizes his or her actions to be legally wrong, may not know the wrongfulness of his or her actions because that defendant acts not on his or her subjective beliefs, *but under the delusive but sincere belief that what he is doing is by the command of a superior power, which supersedes all human laws, and the laws of nature.  In those instances, it cannot be said of the offender that he knows the act to be wrong.*  By contrast, if a defendant knows his or her conduct violates the law and commonly-held notions of morality, that defendant cannot avoid criminal responsibility when he or she acts on subjective rules even though delusions led him or her to believe that he was acting as or like a superior power. (Emphasis added.)

{¶ 17} The trial court rejected this instruction and instead limited the definition of "wrongfulness" to include only whether the defendant knew the act was legally wrong.  The jury instruction stated, "[a] defendant cannot escape criminal responsibility for what he knows

to be legally wrong by assuming a cloak of personal belief that his actions were morally justified, even if the belief arises from mental illness." Both the trial court's instruction and Michael's requested instruction were taken from the Tenth District's decision in *State v. Jennings*, 10th Dist. No. 05AP-1051, 2006-Ohio-3704.

{¶ 18} The insanity defense was codified in 1990 under R.C. 2901.01(A)(14). *State v. Hower*, 3d Dist. No. 2-90-32, 1991 WL 216912, *1 (Oct. 9, 2001). Prior to 1990, the Ohio Supreme Court's test in *State v. Staten*, 18 Ohio St.2d 13 (1969), controlled whether a defendant was not guilty by reason of insanity. In *Staten*, the Court held that "[o]ne accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, *he does not have the capacity either to know the wrongfulness of his conduct* or to conform his conduct to the requirements of the law." (Emphasis added.) *Id.* at syllabus.

{¶ 19} Before the codification of the insanity defense, courts interpreted *Staten* as requiring a defendant to understand the "wrongfulness" of his actions if he knew his behavior was legally wrong. *State v. Jakub*, 8th Dist. No. 59762, 1992 WL 14897, *2 (Jan. 30, 1992); *State v. Luff*, 85 Ohio App.3d 785 (6th Dist.1993). The Eighth District found that where a defendant pled NGRI, evidence that the defendant knew his actions in killing his sister and brother-in law were legally wrong, was sufficient to show that the defendant was not guilty by reason of insanity. *Jakub* at *2. The court acknowledged, "[a]lthough the term 'wrong' is not qualified in a legal or moral sense [in *Staten*], we construe it to mean legally wrong. If we were to enforce our laws according to each individual's moral standards, our society would be one of anarchy." *Id.*

{¶ 20} The Sixth District also interpreted "wrongfulness" to include only legal wrongfulness. *Luff* at 794. In *Luff*, the court determined that the trial court erred in

- 7 -

instructing the jury as to the new statute when the Supreme Court's decision in *Staten* still applied. *Id.* at 793. Despite this, the court stated that, "[u]nder the *Staten* standard of insanity, it must be determined whether the defendant had the capacity *to know that his actions were legally wrong.*" (Emphasis added.) *Id.* at 794. The court went on to state: "'In a criminal case, the accused is charged with violating a specific law, and the design of the insanity defense is to test whether *he has the capacity to know that his conduct would violate the law.*'" (Emphasis added.) *Id.,* quoting *State v. Huntley*, 1st Dist. No. C-800780 (Sept. 2, 1981). *See State v. Graves*, 1st Dist. No. C-790605, 1980 WL 353046 (July 16, 1980), *3 (Noting that trial court's interpretation of *Staten* as concerning legal wrongs rather than moral wrongs is correct).

{¶ 21} Subsequently, R.C. 2901.01(A)(14) was amended to include the not guilty by reason of insanity defense. Notably, the amendment did not change the language used in *Staten* regarding "wrongfulness." Several years after R.C. 2901.01(A)(14) was amended, the Tenth District addressed whether a defendant could be not guilty by reason of insanity for murder and attempted murder of two individuals because he believed those individuals were mass murderers. *Jennings*, 10th Dist. No. 05AP-1051, 2006-Ohio-3704 at ¶ 14. The court found that "wrongfulness" does not include whether a defendant believed his actions to be morally imperative. *Id.* at ¶ 24.

{¶ 22} In so holding, the court cited a famous case from Justice Cardozo which allowed a defendant to be found not guilty by reason of insanity if he acted pursuant to a command from God. *People v. Schmidt*, 216 N.Y. 324, 340 (1915). *Jennings* at ¶ 21. However, the court ultimately stated,

> [d]efendant therefore *is unable to escape criminal responsibility for what he knows to be legally wrong by assuming a cloak of personal belief that his actions were morally justified*, even if the belief arises from mental illness. R.C. 2901.01(A)(14) does not permit individuals who know what is legally wrong to eschew the

law and operate under a standard of morality they set for themselves. (Emphasis added.)

*Id.* at ¶ 24. *See State v. Myers*, 10th Dist. No. 09AP-926, 2010-Ohio-4602, ¶ 13 (Finding defendant not NGRI when he understood moral wrongfulness of his acts).

{¶ 23} We find that the court did not err in refusing to provide appellant's requested jury instructions. All Ohio cases that defined "wrongfulness" as stated in the Ohio Supreme Court's test in *Staten* limited "wrongfulness" to legal wrongs. Additionally, prior to the codification of the NGRI defense in R.C. 2901.01, courts had interpreted "wrongfulness" to focus solely on the defendant's belief that their action was legally wrong. Therefore, the legislature was aware of this interpretation and yet chose to provide the exact same wording regarding "wrongfulness" as stated in *Staten*.

{¶ 24} Further, we do not interpret the Tenth District's decisions in *Jennings* to stand for the proposition that "wrongfulness" includes an inquiry into moral standards or whether the defendant was acting pursuant to a deific decree. While *Jennings* seemed to cite conflicting propositions regarding whether wrongfulness allows for a deific decree exception, the holding was limited to whether a defendant, who killed two individuals whom he believed to be mass murderers, understood the wrongfulness of his actions. Ultimately, *Jennings* concluded that a defendant was not able to eschew the law by doing acts which he knows to be legally wrong because he operates under a different standard of morality he set for himself. Therefore, any language contained in *Jennings* regarding whether a defendant who maintains that he was acting under a command from God does not understand the wrongfulness of his actions was dicta and not the holding of the case. *See State v. Brewer*, 12th Dist. No. CA2003-01-008, 2003-Ohio-5880, ¶ 17.

{¶ 25} Thus, a defendant who knows his actions are against the law but acts under a command from God understands the "wrongfulness" of his actions under R.C.

- 9 -

2901.01(A)(14). The trial court's jury instruction which instructed the jury that a defendant cannot escape criminal responsibility for what he knows to be legally wrong by assuming a cloak of personal belief that his actions were morally justified was a correct statement of law and not an abuse of discretion.

{¶ 26} Additionally, we note that even if "wrongfulness" for purposes of R.C. 2901.01(A)(1) included an inquiry into whether the defendant knew his conduct to be morally wrong because he was operating under a command from God, the facts in this case do not meet this standard.[2] The evidence showed that Michael ultimately did not act on God's voice but instead upon the insistence of a third voice. Dr. Hopes testified that Michael was not convinced that the voice he heard was God and a third voice convinced Michael that his mother was evil and that she needed to die. Additionally, the evidence established that Michael's will was not subsumed by the voice of God as there were several instances in which Michael was able to resist the voice of God. Michael was able to resist previous requests by the voice to kill his mother and his stepfather. Michael also refused to commit suicide shortly after the murder even though God's voice commanded this.

{¶ 27} Instead of acting pursuant to a command from God, Michael was able to appreciate the difference between right and wrong and simply chose to transgress these boundaries. Michael, not the voice of God, planned a ruse to lure his mother into his apartment, chose a murder weapon, and planted the weapon in the kitchen. Additionally, Michael chose to commit the murder in a private location and he changed out of his bloody shirt and washed his hands after the murder. Michael also chose not to stay in the apartment but flee the scene.

---

2. At least one federal court has indicated that in cases in which the defendant's defense was that he operated under a "deific decree," this defense had been successful only four times, and never successful in Ohio. *Lundgren v. Mitchell*, 440 F.3d 754, 773 (6th Cir.2006), fn. 6.

{¶ 28} Therefore, the trial court did not abuse its discretion in refusing Michael's requested jury instructions. The jury instructions correctly stated the law and the facts of this case would not qualify Michael for his requested instruction. Michael's sole assignment of error is overruled.

{¶ 29} Judgment affirmed.

S. POWELL and RINGLAND, JJ., concur.