[Cite as *State v. Liming*, 2023-Ohio-2817.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-01-001 |
| | : | O P I N I O N |
| - vs - | | 8/14/2023 |
| | : | |
| BRIAN R. LIMING, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 21-500-047

Andrew T. McCoy, Clinton County Prosecuting Attorney, and Danielle E. Sollars and David E.S. Milender, Assistant Prosecuting Attorneys, for appellee.

Joseph Hada, for appellant.

**S. POWELL, P.J.**

{¶ 1} Appellant, Brian R. Liming, appeals his conviction in the Clinton County Court of Common Pleas after a jury found him guilty of one count of fourth-degree felony assault on a peace officer in violation of R.C. 2903.13(B) and (C)(6), with an accompanying three-year firearm specification, and one count of third-degree felony tampering with evidence in

violation of R.C. 2921.12(A)(1). For the reasons outlined below, we affirm Liming's conviction.

## Facts and Procedural History

{¶ 2} On February 10, 2021, the Clinton County Grand Jury returned an indictment charging Liming with the two above-named felony offenses and accompanying three-year firearm specification.[1] The charges arose on December 20, 2020, after Liming shot and severely injured Officer Kevin Behr of the Ohio Department of Natural Resources ("ODNR"). This occurred shortly after Officer Behr had set up a decoy deer on the private property owned by Tim and Deb Trayer located in Clinton County, Ohio. Officer Behr set up this decoy deer on the Trayers' property as part of a sting operation to catch unlicensed deer hunters illegally hunting on private properties near the intersection of Macedonia and Martinsville Roads located in Clinton County. There is no dispute that Officer Behr had the Trayers' consent to enter onto their property, as well as set up a decoy deer on their property, as part of this sting operation.

{¶ 3} On November 8, 9, and 10, 2021, the matter proceeded to a three-day jury trial. During the trial, the jury heard testimony from eight witnesses offered by the state. This includes testimony from the victim in this case, Officer Behr. The following is a summary of the testimony and evidence elicited from those eight state witnesses.[2] This summary also includes reference to the parties' joint stipulation of facts. This includes the parties' joint stipulation that, at the time of the shooting, Liming was under a federal firearm

---

1. Liming was also charged with two other third-degree misdemeanor offenses, neither of which are relevant to this appeal. Those offenses were hunting deer without a permit in violation of R.C. 1533.11(A)(1) and hunting wild birds and/or wild quadrupeds without a license in violation of R.C. 1533.10(A)(1).

2. There were two witnesses who testified in Liming's defense. This included Liming himself taking the stand. However, given the five assignments of error presented for review, none require an in-depth discussion of the defenses raised by Liming outside of what is mentioned in those assignments of error. Therefore, in our feeble attempt at brevity, we will forgo summarizing the testimony and evidence Liming submitted as part of his defense case-in-chief.

disability that prohibited him from possessing a firearm due to a prior misdemeanor conviction.

*Summary of Testimony and Evidence Offered by the State's Eight Witnesses*

{¶ 4}  On the afternoon of December 20, 2020, at approximately 3:30 p.m., Thomas Davis was driving his truck north on Martinsville Road with Liming and another man, Brian Achtermann, as his passengers.  Thomas then turned left off Martinsville Road and began traveling west on Macedonia Road.  Shortly after Thomas turned onto Macedonia Road, Achterman said, "Deer."  What Achterman saw, however, was not a deer.  Rather, as noted above, it was a decoy deer that had been set up by Officer Behr approximately 10 minutes earlier.  Officer Behr had set up this decoy deer as part of a sting operation to catch unlicensed deer hunters illegally hunting on private properties near the intersection of Macedonia and Martinsville Roads located in Clinton County.[3]  Such was the property where the shooting occurred in this case.

{¶ 5}  Upon seeing the supposed deer, Liming and Achterman told Davis to keep driving until there was a turnaround.  Davis, doing as he was told, kept driving west on Macedonia Road for about a half-mile.  Davis then turned his truck around and made his way back to where the decoy deer was located.  Davis stopped his truck near the edge of the woods where Achterman had spotted the alleged deer.  Once Davis stopped his truck, Liming exited, carrying his shotgun, specifically, his Remington 1100 LT-20 semi-automatic 20-gauge shotgun loaded with Federal Ammunition 20-gauge sabot slugs.  Liming also brought with him his Bering Optics Hogster VOx thermal optic scope, a device the record indicates has a purchase price of approximately $2,500.

---

3. The record indicates this decoy deer is incredibly life-like as it is a taxidermized white-tailed, antlered deer in a bedded position.  This includes the decoy deer having a remote controlled head and tail that can accurately simulate a real deer's movements.  Those functions did not work on this decoy deer, however, due to having previously been shot in a different sting operation.

{¶ 6}   Davis, the driver of the truck, testified that he thought Liming taking his thermal optics scope with him to shoot a deer was unusual because he had "never seen anyone carry one for deer hunting."  Davis also testified that he would not personally use a thermal optic scope for hunting because "you can't really tell what you're shooting at or, you know, what it is."  Nevertheless, after Liming got out of Davis' truck, Liming made his way down to a patch of trees where the decoy deer was located.  Unfortunately, Officer Behr was at that time crouched down behind the base of three trees situated approximately 81 feet from where the decoy deer had been positioned.  This was unfortunate because, as Officer Behr testified, it was never his intention to be that close to the decoy deer when anybody saw it.  Rather, as Officer Behr testified:

> My intentions were to pick my equipment up and run across the road because right across the road, there's a big weedy like area in the field.  And my intentions were to just keep working my way out to that weedy area to look back across the road and be able to observe the roadway and the decoy, and then if I couldn't find suitable, a suitable area there, I was going to go on across that open field and try to get right along the base of—there's like a hill there or a rise, but my intentions were as soon as I got to my equipment, I was going to pick it up and run across the road.

{¶ 7}   When Officer Behr got back to his equipment, however, he "heard noise," he "heard gravel popping," and "knew there was a vehicle and maybe somebody around [him]."  Officer Behr then testified:

> So as soon as I heard that, I got down on my hands and knees and picked up my radio, my portable radio, and I turned it on, and I told the officers there's somebody here, you know, let's be ready, there's somebody here.

Officer Behr then got down on the ground and tried to make himself into a ball, "as small as [he] could * * *."  Officer Behr, who there is no dispute was at that time clad in camouflage, testified that he then "felt like a sledge hammer hitting [him] in the lower buttocks as hard as somebody could hit with a sledge hammer," followed by what "felt like molten hot steel

being poured through [his] body from [his] lower buttocks up to [his] diaphragm up here." Officer Behr testified that he "felt that first, and then [he] heard the shot."

{¶ 8} There is no dispute that it was Liming who shot Officer Behr in the backside that afternoon. There is also generally no dispute that Liming shot Officer Behr from approximately 51 feet. There is further no dispute that Liming's shot, according to a detective with the Clinton County Sheriff's Office, Detective Robert Gates, "wasn't even close" and "not even anywhere [near]" to where the decoy deer was located. Liming's shot was instead described as being "extremely dangerous" given that Liming was aiming in the general direction of Macedonia Road where Davis was sitting in his truck. Asked to describe what he believed had happened just prior to Liming shooting Officer Behr, Lieutenant Eastes of the Clinton County Sheriff's Office testified, without objection, the following:

> What I think happened is he took, he knew that there was a deer in there, and he went into the woods with his gun and his thermal optic, and he was scanning for a heat signature, and when he found one, he aimed at the heat signature and fired, which was obviously a decoy won't put off a heat signature because it's not alive, and a human, which was in the woods would put off a heat signature.

{¶ 9} Lieutenant Eastes was also asked if he had any concerns about how Liming claimed to have merely been shooting at the base of a tree when he discharged his shotgun. To this, Lieutenant Eastes testified, "Great concerns. Because he did not know where that bullet was traveling. He didn't know what was beyond that, beyond whichever tree he claims he was firing at." Lieutenant Eastes further testified that Liming "firing indiscriminately into a wooded area" was "completely unsafe," and "reckless" when considering "that he just fired it, you know, without aiming or knowing what was behind his shot into an area that he was unfamiliar with." Lieutenant Eastes testified that this was due, at least in part, to there being "a large amount of honeysuckle and saplings and things in that area that were obstructing [his] view." Lieutenant Eastes additionally testified that in his 30-years'

experience as a hunter he did not know anybody that hunted with a thermal optic scope and that he would "[a]bsolutely not" go hunting with a thermal optic scope himself, or ever even take a shot without "visually acquiring" the target that he intended to shoot. Lieutenant Eastes testified that this was "because it's giving off a heat signature, you don't know what the source is," and because "[y]ou have to see the animal with your own eyes to know what it's what you're shooting at is actually a deer or a squirrel or a coyote."

{¶ 10} Davis testified that shortly after Liming had exited from his truck he heard a shotgun blast followed by a man screaming. Upon coming out of his shock, Davis saw flashing lights and heard a siren coming from an approaching officer in an ODNR vehicle. Davis testified it was at that time when he "kind of stuck [his] arm out the window and was pointing at the woods * * *." Davis testified that the approaching ODNR officer then "slowed down to look at [him]," but that he "just kept pointing at the woods." Davis testified the ODNR officer then "heard the screaming as well." Upon hearing this, the ODNR officer told Davis not to leave because he was a witness, so "he said stay put." Thereafter, when asked how he felt during this time, Davis testified:

> Very uncomfortable, nervous, scared. But like I said, when ODNR came flying around the corner, I mean it felt like it was a second or two after everything happened. I felt relieved at that point because, you know, there was somebody there that could go in the woods and take, you know, he—the, you know, the emergency vehicle was there pretty much at that point.

{¶ 11} Officer Jason Keller and Officer Roberts of the Ohio Department of Natural Resources were the first two officers to arrive at the scene where Officer Behr had been shot. Officer Keller testified that upon his arrival Officer Behr was in "a lot of pain" and that he kept saying, "he shot me, he shot me, I've been shot, repeated that over and over." Officer Keller testified that he then noticed "some blood in the butt region," as well as "fecal matter, intestines, the smell was not pleasant, and we could see an entrance hole." Seeing

the severity of Officer Behr's injuries, Officer Keller took the gauze he kept in his vest and placed that into the entrance wound to stop the bleeding and, as Officer Keller testified, "to make sure nothing else comes out that shouldn't come out." Officer Keller testified that Officer Behr was at that time "complaining about pain in his groin region, the swelling," and that Officer Behr kept saying, "don't let me die" and "tell my family I love them." Officer Keller then radioed for "air care, and the EMS to get there as quick as they could." Additional help soon arrived and, after some difficulty loading Officer Behr onto the standard backboard, Officer Behr was carried out onto a stretcher and then into an awaiting ambulance.

{¶ 12} Liming did not stick around after shooting Officer Behr. Liming also did not call 9-1-1 to get help for Officer Behr. This holds true despite Officer Behr yelling out, "you shot me, stop shooting, call 9-1-1, help me, please." Officer Behr testified that Liming instead yelled back "something in the nature of fuck you, you stupid motherfucker, or fuck you, you dumb motherfucker, something along that nature." Liming then fled the scene by making his way through the woods and over towards a nearby fence, where he was seen by Officer Keller standing just inside the tree line. Liming then threw down his shotgun at the bottom of a honeysuckle bush, tossed off his thermal optics scope, and ran out of the woods towards Davis' truck. Once there, Liming told Davis that "there was another person" in the woods and that "we needed to go." Davis responded and told Liming, "the ODNR officer told me to stay put, I was a witness." Davis then took his keys out of his truck and went to stand by his truck's tailgate. Davis testified he did this because:

> I wasn't going anywhere, and I wanted to make sure that, I mean, everyone kind of knew that if my keys weren't in my truck and I was out of my truck. I mean, I wasn't trying to go anywhere, and I wasn't going to go anywhere.

{¶ 13} When his attempts to flee in Davis' truck proved futile, Liming then took off

running through a nearby field and back into the woods. Some minutes later, Liming encountered Sergeant Jeremy Grillot with the Ohio State Highway Patrol approximately three-fourths of a mile away from where Liming had shot Officer Behr. Upon contacting Sergeant Grillot, which the record indicates occurred on Gibson Road nearby to State Route 350, Liming told Sergeant Grillot that "he knew that somebody had been shot" and that he was just "out trying to chase [the] person down" who had done the shooting. More specifically, Liming told Sergeant Grillot that he "he had information to believe that somebody had been shot, he didn't witness it, although he believed it to be an accident and that person had a blue hoodie and he was trying to find them."

{¶ 14} Liming also told Sergeant Grillot, as well as several other ODNR officers who had since arrived to provide backup, that he did not have a gun when asked where the firearm he used to shoot Officer Behr was located. Sergeant Grillot testified that Liming then continued "with his story that somebody was out there that had shot, shot somebody, that, you know, we needed to be looking for them or something to that effect." Liming's story eventually changed after he was handcuffed and placed in the back of Sergeant Grillot's cruiser. As Sergeant Grillot testified, "[a]t that point, he said it was an accident, that it was him that shot [Officer Behr]. He indicated what direction his gun was, said it was me, I'm not trying to cause any trouble."

{¶ 15} While this was happening, the investigation into the shooting of Officer Behr continued. This included another one of the officers on scene, Deputy Dewey Allen, locating the shotgun and thermal optics scope that Liming had thrown down into the woods after shooting Officer Behr. According to Deputy Allen, he was able to see Liming's shotgun and thermal optics scope given that they were "easily visible" from the road approximately 30 feet away. Officer Keller testified that he had also deployed his K-9 partner, Scout, to search for evidence. This too resulted in Scout locating Liming's shotgun and thermal optic scope.

This was in addition to Scout locating a spent "yellow 20-gauge federal sided slug" consistent with the slug Officer Keller had removed from Liming's shotgun.

{¶ 16} Similar to Lieutenant Eastes, Officer Keller further testified that he had never encountered someone who had hunted deer with a thermal optic scope like the one Liming had with him that day. Officer Keller was then asked whether, as a police officer, he would be concerned if he knew someone was using a thermal optic scope to hunt. To this, Officer Keller testified, "Yes, sir." Specifically, Officer Keller testified that a hunter using a thermal optic scope would cause him concern because

> somebody could approach from behind us or from a long distance off, we not being able to see them, but they could basically be looking through brush or across the field and see that heat signature and not properly identity their target or what's beyond their target and take a shot.

Officer Keller testified that this is in addition to the fact that "a lot of the deer that we recovered from this general region are close to the residences out in flat farm fields," so "[w]ho knows where that bullet could have gone exactly."

{¶ 17} Shortly after the shooting took place, another officer with the Ohio Department of Natural Resources, Officer Matthew Hunt, received a call from Liming on his cellphone. (Officer Hunt had previously programmed Liming's phone number into his cellphone after Liming had called him several times with questions about hunting or with information about a dead deer on the side of the road.) Describing this phone call, Officer Hunt testified:

> I answered, I said, [Liming], because I knew it was him. He sounded like he was a little out of breath, and the first thing he said was, I was hunting in Clinton County, and he said something to the effect that there was a shot or somebody shot, and everybody started running, so I ran, and now I got a trooper pointing a gun at me. And I told him right there, I said, you need to do exactly what that trooper is telling you to do.

Officer Hunt testified that he was not sure if Liming had then dropped his phone or what, but he "couldn't directly hear what he was saying or what anyone else was saying, and that

went on for about four minutes or so until the phone disconnected."

{¶ 18} Officer Behr was ultimately flown via life flight helicopter to a nearby hospital for treatment. Officer Behr testified that once there he had "actually coded out," that his "heart quit beating in one of the surgeries and they had to revive [him]." Officer Behr testified that this included hospital staff doing "resuscitation, CPR, and AED shock." Describing his injuries, which also included PTSD, Officer Behr testified:

> [M]y pelvis was shattered. My rectum and colon and most of my intestines were blown out and damaged. My spleen was damaged. * * * My liver was damaged. My kidneys were damaged from the slug itself, and then also from lack of blood from the times that I had low blood or no pulse. I was given or administered 22 units of blood total. My stomach was damaged.
>
> My brain [was also damaged] from being shot because the slug didn't exit, it's like shooting a water bottle, and if you've—we've all seen what a water bottle gets shot, the cap always blows off. Well, the fluid shock and the energy from the slug entering my body just traveled up so it shook my brain pretty good. And then, the—all the time I did with low blood to the brain or no blood to the brain caused issues.
>
> I've got nerve damage on my right side of my leg and my arm from where the slug went through and damaged the nerves. Luckily it missed the main spinal cord by millimeters, but it did do damage to the nerves that are on my right side. I'm trying to think what else. There's a lot.

{¶ 19} The injuries Officer Behr sustained required him to stay in the intensive care unit for 28 days, with 12 of those days being hooked up to a ventilator. Officer Behr testified that this also required him to be on "continuous dialysis because [his] kidneys quit working and were damaged from the shot for 11 days, then partial dialysis after that." Officer Behr further testified that, at the time of trial, he had undergone a total of 14 surgeries, with more surgeries certain to come. This was in addition to Officer Behr testifying that:

> It's been a struggle for me every day. Every day is an absolute struggle. It's the amount of pain, the frustration from not being able to do the things that I have to do, work and the things that I used to do, it's—to say that it's excruciating and challenging is

an understatement.

* * *

The amount of just devastation that happened to me, I mean, I'm permanently mutilated, but what's happened to my family is just excruciating. That's—that's what I struggle with the most is what happened to my family, you know, as a result of this situation.

*Defense Counsel's Closing Argument and the State's Rebuttal*

{¶ 20} After both parties rested their respective cases, the parties then presented their closing arguments to the jury. This included defense counsel noting that the assistant prosecuting attorney "didn't even mention" what it means for a person to act recklessly within his initial closing argument. Liming's defense counsel then stated:

> Why didn't [the assistant prosecutor] bring that up [in his closing argument]? Is [the prosecutor] going to bring that up [in his rebuttal closing argument]? Is he going to talk with you about the word reckless as it means in a legal context? Holy moly, I hope so, that is what this case boils down to, the likelihood that someone else is there. That is what the term recklessness is all about in this context. And we know, we know as we talk into this discussion, we know that there is no one around because [Officer Behr] set the deer up right there.

{¶ 21} Projecting it onto a screen, Liming's defense counsel then read a portion of the trial court's final jury instructions on recklessness to the jury. Specifically, Liming's defense counsel stated:

> Recklessness. This is in your instruction. * * * A person acts recklessly when with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct, I put that in a box, disregards a substantial and unjustifiable risk that the person's conduct, which I have in a box, is likely to cause a certain result, which I also have in a box.

{¶ 22} This is in addition to Liming's defense counsel later telling the jury during his closing argument that:

> Recklessness means it's likely that there's someone else

around because there is a substantial risk that firing your weapon is likely to hit a human being, then it has to be likely that there's another human being around. But there is not.

{¶ 23} As Liming's defense counsel apparently had hoped he would, the prosecutor did bring up the definition of recklessness in his rebuttal closing argument. This included the prosecutor beginning his rebuttal, without any objection from Liming, as follows:

> Before I dive into my closing statement, there's one thing that I want to point out in regards to your jury instructions, and I'm going to talk about it later. And I wanted to make sure that you knew that I had every intention of discussing recklessness despite Defense counsel's moral indignation with the fact that it hadn't been addressed yet.
>
> I feel indignant because, and frankly, I was hoping he was going to leave it up. If you turn to your page [on] recklessness, you're going to see that Defense counsel spent an hour and a half talking about recklessness without ever pointing or directing your attention to the second prong, that being a person who acts recklessly with heedless indifference to the consequences when the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result, and he stopped.
>
> He printed that. He put it on his monitor, and he kept referring to it, and pointing to it, and directing your attention to it and hoping you wouldn't notice the or. Or likely to be of a certain nature.
>
> You want to know why he spent an hour and a half without addressing or is likely to be of a certain nature because, as I'm going to explain to you, it's that second prong that makes his client guilty every day of the week, and twice on Sundays. But we'll come back to that.

{¶ 24} Following these comments, the prosecutor then began his otherwise pre-planned remarks in rebuttal. This included the prosecutor, once again, providing the jury with the full definition of what it means for a person to act recklessly.

*The Trial Court's Final Jury Instructions and the Jury's Guilty Verdicts*

{¶ 25} Once the parties' closing arguments concluded, the trial court provided its final instructions to the jury. This included the trial court instructing the jury on flight as

consciousness of guilt as follows:

> Testimony has been admitted indicating that the defendant left the scene of the alleged crime and attempted to conceal a crime. You are instructed that such conduct if true alone does not raise a presumption of guilt, but it may tend to indicate the defendant's awareness of guilt. If you find that the facts do not support that the defendant left the scene or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by an awareness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

This also included the trial court instructing the jury that the evidence for which it could consider in determining Liming's guilt did not include "anything spoken by the attorneys except the stipulation of facts admitted into evidence."

**{¶ 26}** After the trial court finished with its final jury instructions, the jury was excused from the courtroom to begin its deliberations. Approximately three hours and 15 minutes later, the jury returned to the courtroom with guilty verdicts finding Liming guilty of both fourth-degree felony assault on a peace officer, with the accompanying three-year firearm specification, and third-degree felony tampering with evidence. The trial court then ordered a presentence investigative report be completed and scheduled the matter for sentencing.

*Liming's Post-Verdict Motions, Sentencing, and Appeal*

**{¶ 27}** On November 24, 2021, Liming filed a joint motion for a new trial and motion for acquittal. Liming filed this joint motion pursuant to Crim.R. 33(A)(5) and 29(A). The state filed a memorandum in opposition to Liming's joint motion on December 10, 2021. Shortly before sentencing took place, on December 15, 2021, the trial court issued its decision summarily denying Liming's joint motion for a new trial and motion for acquittal.

- 13 -

The trial court then proceeded to sentencing where it sentenced Liming to serve a mandatory, aggregate sentence of four years and six months in prison, less eight days of jail-time credit. In so doing, the trial court noted within its judgment entry of sentence:

> The victim of the assault offense, a peace officer, suffered serious physical harm. Defendant admittedly was under a disability prohibiting defendant from possessing a firearm yet chose to disregard this disability, commit a criminal trespass, recklessly discharge the firearm causing serious physical harm to the victim who was in the act of enforcing the wildlife laws of the state of Ohio. Defendant then fled the scene of the crime, offered no assistance to the victim, and misled a law enforcement officer on the scene regarding the criminal act he had just committed.

The trial court also ordered Liming to pay court costs and notified Liming that he would be subject to an optional postrelease control term of up to two years upon his release from prison.

{¶ 28} On January 14, 2021, Liming filed a timely notice of appeal from the trial court's judgment entry of sentence. Following several delays, which included this court granting Liming's motion to reopen his appeal pursuant to App.R. 26(B)(5) upon finding Liming's original appellate counsel ineffective for failing to file an appellate brief, oral argument was held before this court on July 10, 2023. Liming's appeal now properly before this court for decision, Liming has raised five assignments of error for this court's review. For ease of discussion, we will address Liming's five assignments of error out of order and Liming's first and third assignments of error together. We will do this by first addressing Liming's second assignment of error.

**Assignment of Error No. 2:**

{¶ 29} THE TRIAL COURT ERRED BY INSTRUCTING THE JURY AS TO THE "FLIGHT" INSTRUCTION AND BY FAILING TO INSTRUCT THE JURY AS TO THE DEFENDANT'S PROPOSED LIMITING INSTRUCTION AND AS TO THE LESSER

- 14 -

INCLUDED OFFENSE OF NEGLIGENT [ASSAULT].

{¶ 30} In his second assignment of error, Liming argues the trial court made three errors in its instructions to the jury. After setting forth the appropriate standard of review, we will separately address each of those three alleged errors.

*Jury Instructions Standard of Review*

{¶ 31} "Jury instructions are matters which are left to the sound discretion of the trial court." *State v. Carreiro*, 12th Dist. Butler No. CA2011-12-236, 2013-Ohio-1103, ¶ 13. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 14. However, although left to the trial court's sound discretion, the trial court must nevertheless "fully and completely give jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact-finder." *State v. Davis*, 12th Dist. Madison No. CA2015-05-015, 2016-Ohio-1166, ¶ 27. But, even then, "this court may not reverse a conviction based upon faulty jury instructions unless it is clear that the jury instructions constituted prejudicial error." *State v. Grimm*, 12th Dist. Clermont No. CA2018-10-071, 2019-Ohio-2961, ¶ 26. "Therefore, when reviewing a trial court's jury instructions, this court must affirm a conviction if the trial court's jury instructions, when taken in their entirety, 'fairly and correctly state the law applicable to the evidence presented at trial.'" *State v. Mott*, 12th Dist. Warren No. CA2022-10-067, 2023-Ohio-2268, ¶ 18, quoting *Davis* at ¶ 28.

*Liming's First Argument and Analysis*

{¶ 32} Liming initially argues the trial court erred by instructing the jury on flight as evidence of his consciousness of guilt. This is because, according to Liming, the "crime" for which he fled from the scene was neither of the two offenses for which he was being tried, assault and tampering with evidence. Liming instead argues that he fled from the

scene because he was under a federal firearm disability that prohibited him from possessing a firearm due to a prior misdemeanor conviction. However, although Liming did testify that he had fled the scene of the shooting due to his being under a federal firearm disability as opposed to either the assault on a peace officer or tampering with evidence charges, it was a question for the jury to determine whether Liming's flight should be considered as evidence of his consciousness of guilt for either of those two offenses. *See State v. Lawson*, 12th Dist. Butler No. CA99-12-226, 2001 Ohio App. LEXIS 1916, *24-25 (Apr. 30, 2001). The instruction provided to the jury specifically stated as much by noting that it was for the jury to determine whether Liming had fled from the scene and, if so, whether his flight from the scene was motivated by his consciousness of guilt "of the crimes charged." This was not an error. *See, e.g., State v. Sexton*, 12th Dist. Warren No. CA2018-08-100, 2020-Ohio-153, ¶ 13 (trial court did not err by instructing the jury on flight as evidence of appellant's consciousness of guilt even though 9-1-1 was called for something other than the crime charged because "it was a question for the jury to determine whether [appellant's] flight from the scene should be considered as evidence of his consciousness of guilt [of the crime charged]"). Therefore, Liming's first argument lacks merit.

*Liming's Second Argument and Analysis*

{¶ 33} Liming next argues the trial court erred by failing to provide the jury with his proposed limiting instruction, "which was a correct statement of the law and was required to be given under Evid.R. 105." Specifically, Liming argues it was error for the trial court not to instruct the jury that his "federal weapon disability [was] not relevant as to whether [he] acted recklessly in firing his weapon and striking Ofc. Behr in this case," and that the jury was "not to consider the fact of [his] federal disability as any evidence relative as to the mental state of recklessness." "Under Evid.R. 105, a party is entitled to a limiting instruction whenever evidence might be misapplied by the jury in reaching its verdict." *State v.*

- 16 -

*Hammons*, 12th Dist. Warren No. CA2004-01-008, 2005-Ohio-1409, ¶ 30. However, even if we were to find the trial court erred by failing to provide the jury with these instructions, for the reasons outlined below in our review of Liming's first and third assignments of error, any error the trial court may have made was harmless given the extensive, overwhelming evidence to support the jury's verdicts finding Liming guilty of both the assault on a peace officer and tampering with evidence charges that he faced. "[A]n error is harmless where there is no reasonable possibility that it contributed to an accused's conviction, such as where there is overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction." *State v. Cox*, 12th Dist. Butler No. CA2003-05-113, 2004-Ohio-4977, ¶ 32. Such is the case here. Therefore, Liming's second argument also lacks merit.

*Liming's Third Argument and Analysis*

{¶ 34} Liming lastly argues the trial court erred by not instructing the jury on negligent assault in violation of R.C. 2903.14(A) as a lesser included offense of assault in violation of R.C. 2903.13(B), one of the two charges for which he was ultimately tried and convicted. But, this presupposes that negligent assault in violation R.C. 2903.14(A) is a lesser included offense of assault in violation of R.C. 2903.13(B). *See State v. Villafranco*, 12th Dist. Clinton No. CA2021-09-029, 2022-Ohio-2826, ¶ 12 ("[i]n considering whether to instruct a jury on lesser offenses, a trial court must first determine whether an offense is a lesser included offense of the crime charged"). It is not. This is because, "negligent assault contains an element which assault does not, namely that the offense must be committed by means of a deadly weapon or dangerous ordnance." *State v. Evans*, 153 Ohio App.3d 226, 2003-Ohio-3475 (7th Dist.), ¶ 40. Thus, "because one can recklessly cause serious harm without, for example, the use of a gun," negligent assault in violation of R.C. 2903.14(A) is not a lesser included offense of assault in violation of R.C. 2903.13(B). *Id.,* citing *State v. Deem*, 40

- 17 -

Ohio St.3d 205 (1988), subsequently clarified in *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974; *see also State v. Baker*, 1st Dist. Hamilton Nos. C-120470 and C-120471, 2013-Ohio-2507, ¶ 11-13 (similarly holding that negligent assault in violation of R.C. 2903.14[A] is not a lesser included offense of assault in violation of R.C. 2903.13[A]). Therefore, Liming's third argument likewise lacks merit. Accordingly, finding no merit to any of the three arguments raised by Liming herein, Liming's second assignment of error is overruled.

**Assignment of Error No. 4:**

{¶ 35} THE TRIAL COURT ERRED IN OVERRULING THE MOTION FOR A NEW TRIAL BASED UPON ERRORS OF LAW THAT OCCURRED IN CLOSING ARGUMENT.

{¶ 36} In his fourth assignment of error, Liming argues the trial court erred by denying his motion for a new trial brought pursuant to Crim.R. 33(A)(5), which allows for a new trial as a result of an "[e]rror of law occurring at the trial[.]" To support this claim, Liming argues the trial court should have granted his motion for a new trial on the assault on a peace officer charge because the state provided the jury with "a flawed and legally incorrect theory of recklessness" during its rebuttal closing argument. However, upon review of the challenged statements made by the state, as well as what Liming's defense counsel argued during his own closing argument, we find it clear that the state was doing nothing more than providing the jury with a more complete explanation of what it means for a person to act recklessly. The state did this in response to Liming shorting the jury regarding what that statutorily defined term means during his own closing argument. The state's response was not error. Therefore, regardless of whether we review this issue under the typical abuse of discretion standard, or whether this issue instead deserves to be reviewed for plain error,

Liming's argument lacks merit.[4] *See State v. Stone*, 12th Dist. Warren No. CA2007-11-132, 2008-Ohio-5671, ¶ 26 ("a motion for a new trial pursuant to Crim.R. 33 will not be disturbed on appeal absent an abuse of discretion"). In so holding, we note that the trial court expressly instructed the jury as part of its final jury instructions that the evidence it could consider in determining Liming's guilt did not include "anything spoken by the attorneys except the stipulation of facts admitted into evidence." "A jury is presumed to follow instructions given by the trial court." *State v. Carpenter*, 12th Dist. Butler No. CA2005-11-494, 2007-Ohio-5790, ¶ 20. Accordingly, finding no merit to Liming's argument raised herein, Liming's fourth assignment of error is overruled.

**Assignment of Error No. 1:**

{¶ 37} THERE WAS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION FOR TAMPERING WITH EVIDENCE IN VIOLATION OF RC 2921.12.

**Assignment of Error No. 3:**

{¶ 38} THERE WAS LEGALLY INSUFFICIENT EVIDENCE TO SUPPORT THE RECKLESS ASSAULT CONVICTION IN VIOLATION OF RC 2903.13(B).

{¶ 39} In his first and third assignments of error, Liming argues the jury's verdicts finding him guilty of assault on a peace officer and tampering with evidence were not supported by sufficient evidence. We will separately address each of Liming's arguments after providing the necessary sufficient evidence standard of review.

*Sufficient Evidence Standard of Review*

{¶ 40} "A claim challenging the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the

---

4. The state notes that Liming did not object during the state's rebuttal closing argument, thus waiving all but plain error. However, as noted above, regardless of whether we review this issue under the typical abuse of discretion standard of review, or whether this issue instead deserves to be reviewed for plain error, Liming's argument lacks merit.

jury verdict as a matter of law." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 165, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "A challenge to the sufficiency of the evidence is reviewed de novo." *State v. Bertram*, Slip Opinion No. 2023-Ohio-1456, ¶ 8. Applying that de novo standard, "[t]he relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Roper*, 12th Dist. Clermont No. CA2021-05-019, 2022-Ohio-244, ¶ 39, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "This test requires a determination as to whether the state has met its burden of production at trial." *State v. Thompson*, 12th Dist. Butler No. CA2022-09-080, 2023-Ohio-559, ¶ 34. "If the state fails to present sufficient evidence on every element of an offense, then convicting a defendant for that offense violates the defendant's right to due process of law." *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 13. "[A] reversal based on insufficient evidence leads to an acquittal that bars a retrial." *State v. Gideon*, 165 Ohio St.3d 156, 2020-Ohio-6961, ¶ 27.

*Assault on a Peace Officer in Violation of R.C. 2903.13(B) and (C)(6)*

{¶ 41} Liming was found guilty of assault on a peace officer in violation of R.C. 2903.13(B) and (C)(6). Pursuant to those statutes, it is unlawful for a person to "recklessly cause serious physical harm" to a peace officer. Liming argues the jury's verdict finding him guilty of assault on a peace officer was not supported by sufficient evidence because the state failed to prove he acted recklessly in shooting Officer Behr. Liming argues the evidence instead shows that he was, at worst, acting negligently when he fired his shotgun into the woods that day. However, despite Liming's claims, we find there was overwhelming evidence to support the jury's verdict finding him guilty of assaulting Officer Behr in violation of R.C. 2903.13(B) and (C)(6). This includes the jury's finding Liming had acted recklessly.

This is because, when viewing the evidence in a light most favorable to the prosecution, the record indicates Liming discharged his shotgun indiscriminately into the woods without first visually identifying the source of the heat signature he picked up on his thermal optics scope.

{¶ 42} This also includes the fact that Liming's conduct was described as "completely unsafe" given Liming's failure to visually acquire his target not knowing what was behind his shot, as well as "extremely dangerous" given the fact that Liming was aiming in the general direction of Macedonia Road where Davis was sitting in his truck. Liming did this all while trespassing on private property that he was otherwise unfamiliar with. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). Such is certainly the case here. Therefore, because we find there was overwhelming evidence to support the jury's verdict finding Liming guilty of assault on a peace officer in violation of R.C. 2903.13(B) and (C)(6), Liming's first argument lacks merit.

*Tampering with Evidence in Violation of R.C. 2921.12(A)(1)*

{¶ 43} Liming was also found guilty of tampering with evidence in violation of R.C. 2921.12(A)(1). Pursuant to that statute, no person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall "[a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]" Liming argues the jury's verdict finding him guilty of tampering with evidence was not supported by sufficient evidence because the state failed to prove he did anything more than "discard" the firearm he used to shoot Officer Behr by dropping it in an area where it could be "easily located and visible from the roadway." However, contrary to Liming's claim, the overwhelming evidence

indicates Liming did much more than merely "discard" his shotgun, "without any attempt to conceal or hide the gun," after shooting Officer Behr.

{¶ 44} The record instead indicates that, after shooting Officer Behr and then cursing at him after hearing Officer Behr ask for help, Liming fled through the woods and over towards a nearby fence. Once there, Liming then threw down his shotgun into the woods at the bottom of a honeysuckle bush, tossed off his thermal optics scope, and ran out of the woods towards Davis' truck. The fact that Liming's attempts to conceal his shotgun were done haphazardly, and ultimately unsuccessfully, does not mean the state failed to prove he had tampered with that piece of evidence. The same is true as it relates to the thermal optics scope that Liming also tossed off before fleeing the scene. Therefore, because we also find there was overwhelming evidence to support the jury's verdict finding Liming guilty of tampering with evidence in violation of R.C. 2921.12(A)(1), Liming's second argument is likewise without merit. Accordingly, finding no merit to either of Liming's two arguments raised herein, Liming's first and third assignments of error are overruled.

**Assignment of Error No. 5:**

{¶ 45} ORIGINAL APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY FILE BRIEF.

{¶ 46} In his fifth assignment of error, Liming argues he was provided ineffective assistance of counsel when his original appellate counsel failed to file an appellate brief, thus prompting this court to dismiss his appeal. *State v. Liming*, 12th Dist. Clinton No. CA2022-01-001 (July 11, 2022) (Judgment Entry of Dismissal). However, given this court's decision to grant Liming's application to reopen his appeal, this court has already addressed

the issue of Liming's original appellate counsel's alleged ineffective assistance.[5]  *State v. Liming*, 12th Dist. Clinton CA2022-01-001 (Dec. 8, 2022) (Judgment Entry Granting Application for Reopening).  We were, in fact, compelled to find Liming's application to reopen his appeal had merit under these circumstances.  *Id.* (finding "[c]ounsel's conduct in this case compels us to find that the application for reopening has merit").  Therefore, while we agree with Liming's argument, the granting of Liming's application to reopen his appeal, along with the timely filing of an appellate brief by new appellate counsel, any prejudice resulting from Liming's original appellate counsel's failure has now been remedied.  *See State v. Cast,* 12th Dist. Butler No. CA2021-09-107, 2022-Ohio-3967, ¶ 34 (finding similar assignment of error moot where the granting of appellant's application for reopening his appeal and the timely filing of an appellate brief by new appellate counsel rendered the assignment of error moot).  Accordingly, because Liming is no longer subject to any resulting prejudice from his original appellate counsel's failure to file an appellate brief, Liming's fifth assignment of error is dismissed as moot.

### Conclusion

{¶ 47} For the reasons outlined above, and finding no merit to any of the five assignments of error raised by Liming herein, Liming's appeal challenging his conviction in this case is denied.

{¶ 48} Judgment affirmed.

PIPER and BYRNE, JJ., concur.

---

5. This court granted Liming's motion to reopen his appeal pursuant to App.R. 26(B)(5), which provides that "[a]n application for reopening shall be granted if there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal."  Ohio appellate courts, including this court, have previously determined that appellate counsel's failure to file an appellate brief resulting in the dismissal of an appeal raises a genuine issue under App.R. 26(B)(5) as to whether an accused has been deprived of the effective assistance of appellate counsel.  *See State v. Howard*, 12th Dist. Warren No. CA83-07-048 (Dec. 20, 2000) (Judgment Entry of Dismissal); *State v. Gaddis*, 8th Dist. Cuyahoga No. 77835, 2000 Ohio App. Lexis 6260 (Dec. 14, 2000); and *State v. Hammon*, 6th Dist. Erie No. E-97-129, 1999 Ohio App. Lexis 261 (Feb. 3, 1999).